**WESTVACO CORPORATION (Formerly West Virginia Pulp and Paper Company)**

v.

**The UNITED STATES.**

No. 152–73.

United States Court of Claims.

Dec. 3, 1980.

Mark Stone, New York City, attorney of record, for plaintiff. Thomas R. Long and John Franco, New York City, of counsel.

William C. Rapp, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS, BENNETT and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

SMITH, Judge: *

Plaintiff seeks refund of federal income taxes paid for the taxable fiscal years ended October 31, 1959, 1960, 1961, 1962, and 1963. In dispute is the proper method of determining the limitation on the amount of the deduction from gross income that will be allowed under section 165 of the Internal Revenue Code (code)[1] for losses sustained to timber as a result of casualty. After having carefully considered the submissions and having heard oral argument, we deny defendant's motion for summary judgment. Plaintiff's cross-motion for partial summary judgment is granted in part and denied in part and the case is remanded to the trial division for further proceedings consistent with our conclusions herein.

The parties agree with each other with respect to a large number of facts and definitions. As stipulated, they are found and adopted by the court for purposes of this case. They are repeated in the opinion only to the extent deemed necessary for action on the motions before us.

At issue is the proper application of section 165 of the code and, in particular, subsection (b) thereof together with Treas.Reg. § 1.165–7 (1976),[2] which operate to limit the amount of the loss, that may be *deducted*, to the *lesser* of either (a) the amount equal to the difference in fair market values of the property immediately after and immediately before the casualty, or (b) the property's adjusted basis for determining loss, provided in section 1011 of the code.

Plaintiff is, and was during the periods in issue, a vertically integrated forest products concern, engaged principally in the production and sale of paper, pulp, converted paper products, timber, and chemicals. Corporate returns for the periods in issue, plaintiff's fiscal years ending October 31, 1959, through October 31, 1963, were timely and properly filed with the Internal Revenue Service,[3] and the amounts shown to be due timely paid. Audit resulted in timely deficiency assessments. Following payment, claims for refund were timely filed and were rejected on May 12, 1971. This suit followed on May 11, 1973. This court has jurisdiction under 28 U.S.C. § 1491 (1976).

---

\* The opinion of Judge Davis concurring in the result follows the appendices to Judge Smith's opinion.

1. 26 U.S.C. § 165 (1976) provides in part as follows:
 "(a) General rule
 "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
 "(b) Amount of deduction

"For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property."

2. *See* Appendix A.

3. Consistent with the accrual method of accounting used in maintaining plaintiff's books and accounts.

Over the years, plaintiff has acquired large areas of timberland for the purpose of supplying itself throughout the foreseeable future with an adequate source of raw material for its mills and other facilities. During the periods in issue, plaintiff's timberlands in both North and South Carolina suffered from the effects of five separate storms and fires: Hurricane Gracie, on September 29, 1959, principally affecting South Carolina; Hurricane Donna, on September 11, 1960, principally affecting North Carolina; wildfires on April 26 and 27, 1961, affecting North Carolina; an ice storm on March 3, 1962, principally affecting the coastal area of South Carolina; and six wildfires during March and April of 1963, principally affecting North Carolina.

The effects of the storms and fires on plaintiff's timberland have been divided into two categories. The first category, referred to as "mortal injuries," deals with those losses resulting from the fact that the storms and fires during the periods in issue destroyed or rendered economically unsalvable some of plaintiff's timber.[4] The parties agree on the volume of timber destroyed, and on the fair market value of the merchantable units represented by destroyed timber, but disagree as to the appropriate legal limitation of the deductible loss.

The second category of losses claimed by plaintiff are those from "nonfatal injuries." Nonfatal injuries are those which are measurable but which did not render timber economically unsalvable, nor did they or would they normally be expected to cause extensive mortality. The nature of these injuries is agreed to by the parties. Plaintiff has agreed that these nonfatal injuries did not, for purposes of this case, result in the actual destruction or loss of any units of merchantable timber present on its timber tracts. Thus, the volume of merchantable timber present, measured in cords or board feet, was the same after the fires and storms as it had been prior to those events, except for the timber destroyed in mortally injured trees.

Plaintiff determined its losses from timber mortally injured by determining the number of cords or board feet which had been lost, multiplying that figure by the then-current fair market value of such timber, and subtracting its salvage value.[5] On audit, the Internal Revenue Service limited plaintiff's loss deduction to the product obtained by multiplying the number of cords or board feet of timber lost by the depletion unit[6] (depletion rate) used for determining the gain or loss from the sale or cutting of timber. Plaintiff's claim for loss deductions relating to nonfatally injured timber, first presented in its claims for refund, was rejected in full.[7]

4. For the purposes of this suit the parties agree that "timber" is defined as all of the merchantable and nonmerchantable wood contained in the standing trees in a given area. "Merchantable timber" is defined as the quantity, in measurable units, of marketable wood which could be economically recovered from standing trees under normal industry practice prevailing in the area during the relevant period. "Nonmerchantable timber" is defined as the wood in a standing tree which is not merchantable timber. "Merchantable tree" is defined as a standing tree containing a sufficient amount of merchantable timber to render its harvest profitable using normal industry practice prevailing in the area during the relevant period. Thus, a merchantable tree may contain both merchantable and nonmerchantable timber.

5. Plaintiff further adjusted the amount of loss, in the case of fires only, by the estimated increase in value of the affected area due to "pine release" which is the elimination or reduction

of vegetative material, usually woody plants and trees, that interfere with the growth of pine trees being managed.

6. Treasury Reg. § 1.611–3(b)(2), reproduced in Appendix B.

7. Both parties agree to the following definitions used for the purpose of measuring merchantable timber:

(1) Sawtimber is the timber contained in trees of sufficient size and quality that it can be converted into solid wood products as lumber, plywood veneer, and poles. Tension wood or compression wood of a sufficiently serious level would downgrade sawtimber to pulpwood. Southern Woodlands defined sawtimber at the time of the casualties as follows:

a. Pine trees 10 inches DBH (diameter breast height) to an 8-inch top diameter that could be converted into lumber.

Critical to resolution of the issues in this case are the questions: (1) Does the section 165 casualty loss deduction include only losses attributable to marketable timber totally destroyed or abandoned as economically unsalvable? (2) What is the identifiable unit constituting the "property" damaged or destroyed? and (3) What is the proper portion of plaintiff's adjusted basis allocable to that property?

In answering these questions it is necessary to consider the nature and extent of timber damage and destruction resulting from storms and fires. We also must determine the purposes and interrelationships of the various statutory and regulatory provisions covering losses, basis, depletion, and perhaps other tax incidents. In addition, a consideration of the business practices of the timber industry generally, and of plaintiff in particular, is required to determine the extent of their bearing on the central issues of the case.

### I.

### Determination of the Loss

■ The limits of a casualty loss will largely be determined by the nature and extent of the causative disaster, but the deduction that will be allowed for "any loss" is, as with all deductions, a matter of legislative grace.

■ Thus, before examining the limitation imposed by the code on the deduction that will be allowed for any loss, it is necessary first to determine the loss itself. The sequence of this approach is compelled by the statutory provisions [8] which apply to losses generally.[9] Subsection 165(a) allows as a deduction "*any loss sustained * * * and not compensated for*" (emphasis supplied), and subsection 165(b) prescribes the basis, for purposes of subsection 165(a), for "determining the *amount of the deduction for any loss.*" (Emphasis supplied.)

That the proper approach is first to delineate the loss is confirmed by the regulations with respect to losses generally,[10] which include language to the effect that "*disallowance*" of certain losses is provided (subparagraph (a)); that "[t]he *amount of loss allowable* as a deduction under section 165(a) *shall not exceed*" (subparagraph (c)(1)); and that proper *adjustment shall be made* for any salvage value and for any compensation received in "determining *the amount of loss actually sustained* for purposes of

b. Hardwood trees 12 inches DBH to a 10–inch top diameter that could be converted into lumber.

(2) Pulpwood—trees of such size that can be harvested and converted into paper or wood fiber products. Pulpwood denotes trees of a size or grade that are not suitable for manufacture into solid wood products. Southern Woodlands, at the time of the casualties, defined pulpwood as follows:

a. Pine trees 5 inches DBH and above to a 4–inch diameter top and a merchantable length of at least 10 feet that are not suitable for use in lumber manufacture to a maximum size acceptable by the user.

b. Hardwood trees 8 inches DBH to a 6-inch top not suitable for manufacture into lumber to a maximum size acceptable by the user.

(3) A cord is defined as a stacked measure of wood occupying a space 4′ × 4′ × 8′ or 128 cubic feet of stacked wood. A cord is the normal and usual unit in which timber is sold and measured for use as pulp in the forest products industry in the relevant area and was used by plaintiff in estimating its losses from the events described.

(4) MBF is defined as a thousand board feet and is related to a scale. There is the Doyle log scale, Scribner log scale, International log scale, Local log scale, Mill Run scale, and combinations of these scales. Plaintiff used the Doyle log scale in estimating its losses from the events described, as that was the common and usual log scale used for measurement and sale of sawtimber in the area at that time.

(5) For depletion purposes, 1 MBF, Doyle log scale, equals 3.5 cords.

8. *See* note 1, *supra.*

9. Subsection 165(a) does not expressly include casualty losses, but subsection 165(h) gives specific statutory recognition to the fact that "any loss attributable to a disaster" is deductible under subsection 165(a), and provides an election to deduct for the taxable year preceding occurrence of the disaster "*so much of the loss* as would have been *deductible* in the taxable year in which the *casualty* occurred." (Emphasis supplied.)

10. Treasury Reg. § 1.165–1(a)–(c) (1976), reproduced in Appendix C.

section 165(a)" (subparagraph (c)(4)). (Emphasis supplied.) Further confirmation is found in the regulations specifically applying to casualty losses, which state that "*any loss arising from * * * casualty is allowable as a deduction under section 165(a),*" and which also make reference to the manner of determining the *amount* of a casualty loss allowable as a deduction in computing taxable income.[11] (Emphasis supplied.)

Defendant does not dispute that plaintiff's merchantable trees have suffered casualties which produce losses from mortal and nonfatal injuries as well, or that measurable nonfatal injuries, of the type claimed by plaintiff, will tend to affect a particular tree's rate of growth, so that at harvest it may produce a lesser quantity of merchantable timber than it might be expected to have produced, absent the particular injury, or be usable only as a source of pulp. In essence, defendant's disallowance of a deduction in any amount for *any loss* due to nonfatal injuries is based on defendant's contentions that nonfatal injuries are "legally insufficient" to support a current loss deduction and, further, that plaintiff is incapable of estimating the claimed reduction in future growth or otherwise prove that a claimed reduction in overall fair market value of the woodlands would measure such loss, or that such an overall reduction in fair market value occurred at all.

■ Defendant also contends that, for Westvaco's losses to qualify under section 165(a), plaintiff's casualty must be evidenced by a closed transaction, and plaintiff's property must be totally worthless or abandoned prior to the taking of the casualty loss deduction. In *Hubinger*,[12] involving destruction by fire of the upper portion of a rental building, and smoke and water damage to the lower floors, the second circuit stated that a net loss of value, limited by cost basis, resulting from partial damage due to casualty was a closed transaction *pro tanto*, entitling the taxpayer to a casualty loss deduction. This characterization of a casualty loss has not been overruled. Nor is it required that plaintiff, in all instances, abandon its property before taking a casualty loss. In the *S. S. White* case [13] taxpayer was permitted to take a casualty loss deduction after the German Government had sequestered its property during World War I. What the code envisions is a loss of capital, a true economic loss to the taxpayer for which he is allowed a deduction not exceeding his adjusted cost basis.[14]

■ Defendant has projected a challenge to plaintiff that goes too far; true, plaintiff is required to show that it "parted with" property of value, but whether such property must be measured in cords and board feet, as contended by defendant, is one of the very questions in issue. Plaintiff claims that a property from which it has been permanently separated by the casualties is a substantial *part* of its formerly healthy, timber-producing growth. If so, this is a partial loss that may entitle plaintiff to a casualty loss deduction.

Defendant's primary defenses beg the question whether such losses asserted by plaintiff in fact occurred. If such defenses were upheld, plaintiff would effectively be barred from even attempting proof of any such loss. Section 165(a) of the code and Treas.Reg. § 1.165–7(a)(1) provide that *any loss* [15] arising from fire, storm, shipwreck,

11. Treasury Reg. § 1.165–7(a)(1) (1976), reproduced in Appendix A.

12. *Hubinger v. Commissioner*, 36 F.2d 724, 726 (2d Cir. 1929), *cert. denied*, 281 U.S. 741, 50 S.Ct. 347, 74 L.Ed. 1155 (1930).

13. *United States v. S. S. White Dental Mfg. Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927), *aff'g* 61 Ct.Cl. 143 (1925).

14. *J. G. Boswell Co. v. Commissioner*, 34 T.C. 539 (1960), *aff'd*, 302 F.2d 682 (9th Cir.), *cert. denied*, 371 U.S. 860, 83 S.Ct. 118, 9 L.Ed.2d 99

(1962); *see Citizens Bank of Weston v. Commissioner*, 28 T.C. 717 (1957), *aff'd*, 252 F.2d 425 (4th Cir. 1958).

15. Prior to adoption of the 1954 Code the predecessor provisions referred simply to "losses sustained" or "losses actually sustained," in themselves nonexclusory terms, now made explicitly so by use of the adjective "any."

or other casualty *is allowable.* In our opinion, there is nothing in those provisions that would bar recognition of such losses, *as losses,* whether they resulted from mortal or nonfatal injuries, to merchantable or nonmerchantable timber, including mature or partially mature trees or even immature plantations. If any of such losses were sustained by plaintiff's property, as evidenced by a reduction in its fair market value, then they are allowable losses under subsection 165(a). Whether deduction for any such loss will be *allowed* and, if so, to what extent under subsection 165(b), is another question.

As a theoretical matter, a partial loss of timber due to casualty is no different from the partial destruction of a building due to casualty. Damage to its income potential as well as to its physical state may demonstrably have decreased its fair market value. In the latter situation the casualty loss deduction is obviously allowable. When dealing with organic properties, however, the case law itself presents inconsistencies.

Nevertheless, the case law provides specific instances of judicial allowance of a deduction for partial damage to as well as total destruction of trees of various types caused by such casualties as ice and wind.[16] Defendant's arguments all but ignore these cases, and it rests this part of its defense primarily on an assumption that the recognition of such losses, as qualifying under section 165(a), is now effectively barred by *Rosenthal,*[17] *Harper,*[18] and *Ward.*[19] In this we are unable to agree with defendant, for reasons set forth, *infra.*

The enormity of the destructive casualties which struck the two timberlands involved is demonstrated by the facts that Hurricane Gracie affected approximately 250,000 acres, or 50 percent of the 500,000

acres of plaintiff's tract known as "Southern Woodlands"; Hurricane Donna affected approximately 225,000 acres, or 75 percent of the 300,000 acres of plaintiff's tract known as "North Carolina Woodlands"; and that the damage from the fires and ice storms that struck in 1961, 1962, and 1963 involved respectively approximately 10,000, 200,000, and 33,000 acres.

As late as 1950 the Tax Court recognized that a partial loss of fruit trees in taxpayer's groves was a deductible loss. As stated in *Krome* :[20]

Petitioners rely upon *I.T. 3921,* 1948–2 C.B. 32 * * * and G.C.M. 6122, *VIII–2 C.B.* 115 * * * as authority for their deduction of partial losses to their fruit trees. Respondent, however, has disallowed all such deductions of partial losses and has conceded loss to petitioners' groves only as to the trees that were totally destroyed by the hurricane. It is respondent's position that no deduction should be allowed for trees partially destroyed because, he contends, substantially all the damage to such trees can be classified as "incidental or minor damage or mere retardation of growth," deduction for which is held not allowable under *I.T. 3921, supra.* [Footnotes omitted.]

We do not agree. If deductions for partial losses to fruit trees are not allowable in the instant case, it is difficult to conceive of a case in which they would be allowable. Here an exceptionally severe hurricane, with winds sometimes reaching 150 miles per hour, passed directly through petitioners' groves, destroying, uprooting and twisting trees and breaking off large limbs, smaller branches, and leaves. At the time of the hearing in April 1949, 3½ years after the hurricane, petitioner William H. Krome testified

---

**16.** *Whipple v. United States,* 25 F.2d 520 (D.Mass.1928); *Nash v. Commissioner,* 22 B.T.A. 482 (1931); *Davis v. Commissioner,* 16 B.T.A. 65 (1929); *Hall v. Commissioner,* 16 B.T.A. 71 (1929).

**17.** *Rosenthal v. Commissioner,* 416 F.2d 491 (2d Cir. 1969), aff'g 48 T.C. 515 (1967).

**18.** *Harper v. United States,* 274 F.Supp. 809 (D.S.C.1967), *aff'd,* 396 F.2d 223 (4th Cir. 1968).

**19.** *Ward v. United States,* 192 Ct.Cl. 710, 428 F.2d 1288 (1970), *cert. denied,* 400 U.S. 1008, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971).

**20.** *Krome v. Commissioner,* 9 T.C.M. 178, 188 (1950).

that petitioners' groves had not yet recovered from the effects of the hurricane, * * *. * * *

■ Therefore, as a matter of law, there is no bar to recognition of a partial loss of timber as a legitimate casualty loss. In this respect we agree with plaintiff and hold that plaintiff's allowable loss for casualty damage to or destruction of its timber is not limited to merchantable units of timber totally destroyed. However, plaintiff's calculation of the loss can only represent the change in fair market *value* attributable to the damage or destruction; it cannot deduct future profits,[21] nor can it deduct paper losses.[22] Plaintiff is only partially correct in stating that it need only establish that direct physical damage occurred to merchantable trees in order to satisfy the test for an allowable casualty loss. In doing so, it must in addition establish that the damage and destruction resulted in a reduction of the fair market value of the "single, identifiable property." If these claims of loss due to partially destroyed timber can be measured with an accuracy sufficient to prevent plaintiff from gaining a tax benefit from mere paper losses or anticipated future profits, or losses of property for which it has no basis, then plaintiff may recover.

■ The resolution of this question must be deferred. Both the existence and extent of the casualty loss, as well as the amount of such loss to be taken into account, for purposes of the deduction provided by section 165, are matters of proof for which the burden lies upon plaintiff;[23] they are not facts to be assumed by any prerogative resting with either party. There appear to be sufficient stipulated facts to determine the basis which may limit the deduction. The extent of the loss, on the other hand, is a fact that has not yet been established. Thus, we are precluded from entering summary judgment. Defendant erroneously

contends that it is irrelevant that expert testimony may generate "a number," but defendant's own regulation expressly provides that the loss "shall generally be ascertained by competent appraisal."[24]

Because of our holding, *infra*, as to the identity of the single property, an aggregation of the value of destroyed units of merchantable timber, together with the value of the partial losses resulting from nonfatal injuries to merchantable trees, does not necessarily measure the reduction in fair market· value of the property. Plaintiff itself argues that determination of the full loss may require a consideration of additional intangible factors, as, e. g., changes in access to and changes in density of the timber, changes in supply and demand, and possible offsetting benefits such as pine release. The existence of these factors as well as their significance, if any, in determining fair market value of "the property" are facts which will undoubtedly require additional proof. The factual determination of the loss is essentially a valuation question, and we remand it to the trial division, where our trial judges are eminently experienced and competent in such determinations.

## II.

### *Determining the Amount of the Deduction*
#### A. *Interrelation of Loss, Basis, and Depletion*

■ The general rule for determining the amount of a casualty loss to be taken into account as a deduction is deceptively simple, and not in dispute. In essence one determines the difference between the fair market values of the affected property immediately before and immediately after the casualty, and compares this amount to the adjusted basis for determining loss of such property computed in accordance with sec-

---

**21.** *Hort v. Commissioner*, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); *J. G. Boswell Co. v. Commissioner, supra* note 14.

**22.** *Grant v. Commissioner*, 30 B.T.A. 1028, 1039 (1934); *A. Giurlani & Bros., Inc. v. Commissioner*, 119 F.2d 852, 857 (9th Cir. 1941).

**23.** *duPont v. United States*, 385 F.2d 780, 783 (3d Cir. 1967).

**24.** Treasury Reg. § 1.165–7(a)(2)(i), reproduced in Appendix A.

tion 1011 of the code. Whichever amount is lesser is the limit on the amount of the loss to be taken into account.[25]

■ The reason for imposing, on the deduction, a limitation grounded in "basis" may be explained more understandably in the thumbnail terms of a "footnote hornbook."[26] In terms of the "thumbnail" purpose, the deduction for a casualty loss is only one of the many economic setbacks (or advances) that may affect taxable income, therefore the identity of "the property," the loss of which will generate the deduction, must be reasonable in relation to the loss. As an obvious example, it could not reasonably be contended that all of the collective assets of Westvaco are "the property" for casualty loss purposes, even though collectively they are a reference point for determining a net loss or overall economic setback.

No one denies that the "single, identifiable property damaged or destroyed"[27] must be ascertained in order to delineate the casualty loss, the fair market values, the adjusted basis, and, ultimately, to determine the allowable deduction, if any.

Simply stated, plaintiff contends that the single property is all of the timber in an area and that the basis for limiting the loss deduction is plaintiff's adjusted basis in all the timber in that area (exclusive of that portion of its cost allocated to the land); defendant's contention is basically that the single property is defined by merchantable units (board feet, cords, etc.) of timber represented in the trees totally destroyed, and that the basis of such property is the depletion unit ("depletion rate") for each such merchantable unit.

Defendant's defenses, set forth in its motion for summary judgment, are basically two: (1) that it is supported in its position by legislative intent, clearly reflected in the pattern of provisions covering loss, basis, and depletion, that the basis for depletion shall determine the limitation on the loss, and (2) that its position has been confirmed and plaintiff's rejected by two courts of appeal.

It is our opinion that the interrelationship of loss, basis, and depletion, revealed by an analysis of the statute and regulations, supports plaintiff and not defendant.

During the proceedings before the Internal Revenue Service in this case, defendant, on June 30, 1967, received support for its position when the United States Tax Court decided *Rosenthal v. Commissioner.*[28] In the same year, defendant received further support in plaintiff's own circuit in *Harper,*[29] which relied upon the Tax Court's opinion in *Rosenthal.* The *Harper* case was affirmed *per curiam*[30] in 1968. The admin-

---

25. There is an exception which permits deduction of the full adjusted basis of property used in a business or for production of income that is totally destroyed, if the fair market value of the property, immediately before the casualty, is less than such adjusted basis. The factual prerequisite for application of this exception is not present here regardless of which "single, identifiable property" contended for is adopted. Treasury Reg. § 1.165–7(b)(1), reproduced in Appendix A.

26. As distinguished from a "headnote" one. There is a general purpose to subject to income taxation a taxpayer's true or net increase in capital, modified by established rules of realization and recognition as well as of exclusion and exemption. To the extent that taxation of economic "advances" is limited by a relation to existing capital, it is equally appropriate that the allowance of economic "setbacks" be limited, for income tax purposes, to that portion of the loss that has previously run the gauntlet of the Internal Revenue Code. The court makes no claim that this oversimplification is a fully accurate or even adequate substitute for the millions of words generated since 1913 in the Constitution, the Internal Revenue Code, and in regulations, rulings, and opinions without number. The image is suggested by the lyrics of a bit of Chambers music which was a variation on a theme by Hand, L. See *Prather v. C.I.R.,* 9 Cir., 322 F.2d 931 at 937 and 57 Yale L.J. at 169.

27. Treasury Reg. § 1.165–7(b)(2)(i), reproduced in Appendix A.

28. *Rosenthal v. Commissioner,* 48 T.C. 515 (1967).

29. *Harper v. United States,* 274 F.Supp. 809 (D.S.C.1967).

30. *Harper v. United States,* 396 F.2d 223 (4th Cir. 1968).

istrative proceedings in the instant case, suspended when *Rosenthal* was appealed, were resumed when the second circuit, relying in part on *Harper,* affirmed [31] the Tax Court.

Notwithstanding the decisions in *Harper* and *Rosenthal,* we think defendant's rigid adherence to the merchantable unit, used for purposes of depletion, as the only acceptable "single, identifiable property" for determining the casualty loss and the limit on its deduction is erroneous and not legally justified. To the extent that *Harper* and *Rosenthal* are not distinguishable, we respectfully consider the decisions in those cases to be in error on this issue.

Our brother Judge Laramore has said that there is a "designed interrelationship" of the basis provisions, and that the basis of property plays a "prime role * * * in determining tax liability." [32] Defendant would relegate basis from its prime role to a role inferior to that of depletion. This is not the scheme and pattern of the code.

Basis is a fundamental [33] concept that pervades the Internal Revenue Code. Depletion, on the other hand, like casualty loss, is merely one of the deductions given to taxpayers by Congress. What Congress giveth, Congress can taketh away or changeth, and it has from time to time. Congress could excise from the code all of subchapter I dealing with Natural Resources, including the deduction for depletion, without touching section 165, in which case the limitation on the deduction for casualty losses would still be "the adjusted basis provided in section 1011 for determining * * * *loss.*" (Emphasis supplied.) There is *no* reference to depletion or to the adjusted

basis for determining *gain* in section 165, even in the cross-reference provisions.

Nor would excision from the code [34] of the depletion provisions have any material effect on the provisions relating to basis. Depletion is not mentioned in the cross-reference provisions of parts I and II (sections 1001–23) of subchapter O where the fundamental basis provisions are found. The most that would be required after excision of the depletion deduction provisions would be technical amendments, not to make substantive changes, but merely to remove excess statutory verbiage no longer having any application, appearing in section 1016(a). In other words, no adjustment under section 1016 would need to be made to basis for deductions allowed or allowable for depletion, since there would be no such deductions. Compliance with the provision requiring adjustment for depletion would result in an adjustment of zero. All of the other adjustments to basis required by section 1016, including adjustments for losses and for deductions for depreciation, amortization, etc., would be unaffected.

The deductions presently allowed for depletion derive *from* basis, not the other way around. Congress, rather than eliminate timber depletion, could with little effort change "the basis on which depletion is to be allowed." Depletion does not *have* to be related to the "adjusted basis provided in section 1011 for the purpose of determining * * * *gain.*" [35] (Emphasis supplied.) Depletion could even be allowed on the basis of fair market value, as it once was in the case of discovery depletion for mines. [36] Or depletion could be allowed on the basis of a percentage of gross income from the property, as it presently is in the case of natural

---

**31.** *Rosenthal v. Commissioner,* 416 F.2d 491 (2d Cir. 1969).

**32.** *Philadelphia Park Amusement Co. v. United States,* 130 Ct.Cl. 166, 172, 126 F.Supp. 184, 188 (1954).

**33.** Sometimes termed "Constitutional."

**34.** All references to the code are to 26 U.S.C. (1976).

**35.** I.R.C. § 612. The basis for determining *depreciation* also refers only to *gain.* There *can* be a difference between the basis for determining *gain* (referred to in section 612) and the basis for determining *loss* (referred to in section 165(b)). See sections 167(g) and 1015(a) and Treas.Reg. §§ 1.167(g)–1 and 1.1015(a)(1) and (2).

**36.** Int.Rev.Code of 1939, § 114(b)(2).

deposits.[37] If Congress established an appropriate percentage depletion rate for timber, Congress could, without touching the basis provisions, increase or decrease the prescribed percentage, as it has done in the case of oil and gas wells.[38]

The designed interrelationship of the loss provisions with the basis provisions is unconcerned with depletion except incidentally, as one of the adjustments to be made to basis, as noted above.

▆ It is not an exercise in semantics to parse the pertinent provisions of the code. Their interrelationship *is* a designed one, and there is a path which can be and must be threaded, no matter how obscure it may seem.[39] Dissection of the code and regulations is the only way to determine which party has taken the correct position. The thread, when stretched out in its composite parts, confirms that the determination of a casualty loss deduction is restricted to a consideration of the loss and basis provisions. No reference need be made to the depletion provisions. When determined, the deduction of the loss will be used to adjust taxpayer's basis. When that is done, and not before, the adjusted basis will then be used to adjust the depletion rate. The present identity of the depletion rate for a cord of wood with the rate of recovery of timber capital is based on the derivation of the depletion rate from adjusted basis and not the reverse.

Section 165(b) establishes "*the basis for determining the amount of the deduction for any loss.*" That basis "*shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.*" (Emphasis supplied.)

Section 1012 provides that "[*t*]*he basis of property shall be the cost of such property.*"[40] (Emphasis supplied.)

Section 1011 provides that "[*t*]*he adjusted basis for determining the* * * * *loss* from the sale or other disposition of property * * *shall be the basis* (*determined under section 1012*[41] [*cost*] * * *) *adjusted as provided in section 1016.*" (Emphasis supplied.)

Section 1016, "*Adjustments to basis,*" provides that:

> *Proper adjustment* in respect of the property *shall in all cases be made*—
>
> (1) *for* * * * *losses* * * * *properly chargeable to capital account,* * * *
>
> \* \* \* \* \* \*
>
> (2) * * * *for* * * * [depreciation], amortization, and *depletion, to the extent of the amount*—
>
> (A) *allowed as deductions in computing taxable income*
>
> \* \* \* \* \* \*
>
> *but not less than the amount allowable* * * *. * * * [Emphasis supplied.]

With respect to taxable income, section 63 provides that "for purposes of this subtitle [A—Income Taxes] the term '*taxable income*' means *gross income, minus* the deductions allowed by this chapter [1—Normal Taxes and Surtaxes]." (Emphasis supplied.) Such deductions include casualty losses.

---

**37.** I.R.C. § 613(a).

**38.** See I.R.C. § 613(b).

**39.** One eccentricity of tax lawyers in particular is that they approach the Internal Revenue Code somewhat as a game or challenge and not with a self-defeating fear that it is a foreboding and impenetrable morass which Trial Judge Fletcher has otherwise described as "a conspiracy in restraint of understanding." This eccentricity has its beneficial side-effects. It helps avoid a total loss of vocabulary so that at social functions tax lawyers, although compelled to talk shop, do not always confine their vocabu-lary to section numbers, rumors to the contrary notwithstanding.

**40.** "[E]xcept as otherwise provided in * * * [subchapter 1–O, 'Gain or Loss on Disposition of Property,' subchapter 1–C, 'Corporate Distributions and Adjustments,' subchapter 1–K, 'Partners and Partnerships,' and subchapter 1–P, 'Capital Gains and Losses']." The depletion provisions are contained in subchapter 1–I, "Natural Resources."

**41.** And, again, under other applicable sections of subchapters 1–O, 1–C, 1–K, and 1–P (but not including 1–I).

For the deduction of losses, including casualty loss, this is the legislative track, along which depletion is only an ephemeral way station. If the way station of depletion is eliminated, the track of casualty losses remains the same.[42]

We find it unnecessary to decide whether "any loss" from casualty is an "other disposition" and the equivalent of a partial *sale* as contended by defendant. We point out that section 1002[43] would by the defendant's analogy require that *"the entire amount of the * * * loss* [from the partial 'sale'], determined under section 1001, shall *be recognized."* (Emphasis supplied.) Section 1001 provides that the "loss shall be the excess of the *adjusted basis* provided in * * [section 1011] * * * for determining *loss* over the amount realized." (Emphasis supplied.) No amount is realized from a casualty loss. Realization, if any, would probably derive from insurance,[44] paid for by the taxpayer, or damages, paid for by some tortfeasor, in which case the loss would be "compensated for." [45]

One important difference between the loss and depletion "tracks" is that Congress, in section 611(a), specifically grants defendant authority to prescribe regulations under which a reasonable allowance for depletion and depreciation of natural resources may be allowed, "according to the peculiar conditions in each case." The authority of these long and detailed regulations cannot exceed their statutory foundation, and certainly

does not extend over section 165, or section 1011. Their imposition on the computation of the allowance of deductions for casualty losses makes no sense unless one first assumes that such transmutation of authority exists. The current coincidental identity of the basis for depletion with the adjusted basis for determining gain on the sale, exchange, or other disposition of a unit of sawtimber or pulp logs is only one clue as to the identity of *the* property. In our opinion, deficiencies in the facts and the framing of the issues in *Rosenthal* and *Harper* were factors which took those courts of appeal down the wrong path. The facts in this case have been thoroughly and extensively stipulated. The issues foreclosed by the facts or pleadings in those earlier cases are before this court. These facts support the hypothesis of Judge Moore in his dissent in *Rosenthal.*[46]

An analysis of the depletion regulations, together with other significant factors, absent any predisposition as to the identity of "the property," will not support defendant's case.

The pertinent portions of paragraph (a) of Treas.Reg. § 1.611–3,[47] stripped to their fundamentals, provide that *the basis provided by section 612 is,* in general, *the capital remaining* in any year *that can be recovered through depletion allowances.* No reference is made to the capital that can be recovered through some other allowance, as,

---

**42.** Likewise, if the deduction for casualty losses, but not depletion, should be eliminated, a similar, but not identical track for the deduction of depletion, and its adjustment to basis, would exist after as well as before the excision.

**43.** Now section 1001(c) of the code.

**44.** None of the losses claimed here was compensated for by insurance or otherwise.

**45.** We also point out that "disposition" normally has a transitive connotation consistent with the terms "partial sale" and "basis for determining *gain."* This is not necessarily so in a loss, which is usually involuntary if not passive, and especially a casualty loss, where there is no inference of transitive action by the taxpayer and where the appropriate basis is the "basis for determining *loss."* (Emphasis supplied.) In this sense, a partial sale can generate gains (as well as losses) providing an eco-

nomic "advance" from which depletion may be deducted. A casualty loss, on the other hand, could not possibly, consistent with the purpose of the limitation, confer an "advance" or gain upon the taxpayer. Without a taxable economic advance there is nothing from which anything could be deducted, including an allowance for depletion. *See also* Judge Durfee's remarks in *Ward v. United States, supra* note 19, 192 Ct.Cl. at 718, 428 F.2d at 1293.

**46.** *Rosenthal v. Commissioner, supra* note 31, 416 F.2d at 500.

**47.** All references made in this part of the opinion to depletion regulations, without stating the full citation, are to Treas.Reg. § 1.611–3(a) through (h) (1976), "Rules applicable to timber," reproduced in Appendix B.

for example, allowance of the deduction for casualty loss, or allowance, against the sales proceeds, of the adjusted basis provided by section 1011 in the event of a sale of the land and timber as a tract. Paragraph (a) further provides that *the costs of planting* of timber *shall be capitalized* and *shall be recoverable through depletion allowances.* This is consistent with the requirements contained in paragraphs (c)(2) and (d)(3) of the regulation that

> a reasonable portion of the total value or cost [of land and timber] shall be allocated to such immature timber, and when the timber becomes merchantable such value or cost shall be recoverable through depletion allowances.

The apparent failure of taxpayers in *Rosenthal* and *Harper* to allocate any basis to immature growth, as so required, provided such property of those taxpayers with no basis for determination of gain or loss, and accordingly no basis for either depletion, casualty loss, or as offset against sales proceeds in the event of a taxable disposition. If those deficiencies led the courts in those cases to enunciate too broad a rule for the facts before them, as Judge Moore's dissent in *Rosenthal* protests, such is not the case here. When Westvaco's immature growth matures, its adjusted basis will be recoverable through depletion; if it is sold, it is recoverable through an offset against the sales proceeds; and if it is damaged or destroyed by casualty, such destruction qualifies for an allowance under the term "any loss" used in section 165(a), limited by such adjusted basis.

Paragraph (b)(1) of the regulation provides that the *depletion of timber takes place at the time timber is cut.* Common sense requires no discussion of the possible argument that the blowing away of timber, or damage or destruction to timber caused by defoliation, twisting, snapping, uprooting, expansion of frozen fluids, or consumption by flame constitute "cutting." It is a *casualty* to timber that takes place at the moment of those disastrous events, not a cutting.

Paragraph (b)(2) of the regulation provides that the *depletion unit* of the timber for a given timber account in a given year shall be obtained by means of a prescribed formula. That formula essentially requires that a numerator, ascertained by application of capital cost factors to merchantable timber and adjustments thereto (the immature growth having been allocated a separate portion), provided for in sections 1012 and 1016, be divided by a denominator calculated in an estimated number of *units of timber.* The quotient provides a rate of depletion for each unit of merchantable timber estimated to be contained in the timber account. The *number of units* of timber in a timber account *cut* during the year, *multiplied by the* depletion unit (*rate*) applicable to such timber in such account in such year shall be the *amount of depletion allowable.* That amount is charged to the depletion account and credited as such units of timber are *sold.* The *effect* of crediting the account upon sale is to match the depletion deduction with the receipt and clearly to reflect income. The disposition of the unit results in an elimination, by recovery of capital, of a portion of the basis for depletion. That basis in turn is measured by the adjusted basis provided in section 1011. The adjustment downward of the section 1012 basis required by section 1016 is necessary so that capital already recovered and however recovered will not be reflected in the section 1011 basis of the property and be recovered more than once, whether by depletion, casualty loss, sale, exchange, or otherwise. Again, the adjustment to section 1012 basis by the amount of the allowable depletion is only *one* such adjustment. Adjustments in addition to that for depletion establish the adjusted basis provided in section 1011. Again, the basis for depletion derives from such adjusted basis and not the other way around.

Paragraph (b)(3) provides that *when a* taxpayer has elected under section 631(a) to *treat the cutting* of timber *as a sale* he shall reduce the timber account by an amount equal to the adjusted *depletion* basis of such timber. Defendant advances an argument that permission to "deem" a cutting to be a

sale supports defendant's argument that a casualty loss shall be deemed to be the "cutting" that generates a recovery of capital "through depletion allowances." The simple fact that there is *no cutting* and therefore *no opportunity for election* by the taxpayer disposes of this argument. Again, the provisions for "inventorying" the depletion unit of "deemed" sales is related to the matching of deductions with receipts. There are no "receipts" in a casualty loss. It is a deduction entirely related to *gross* income, if any, from all sources.

Paragraph (c)(1) provides that "[e]very *taxpayer* claiming or *expecting to claim* a deduction for *depletion* of timber property *shall keep* accurate *ledger accounts* in which shall be recorded the *cost* or other *basis* provided by *section 1012* of the *property and land together with * * * adjustments* provided by *section 1016.*" (Emphasis supplied.) The clear inference is that a taxpayer with timber property but *not* expecting to claim depletion is *not* required to keep, in this specifically prescribed form of timber depletion ledger accounts, this essential *basis* information which he *must* have in order to substantiate reported gain or loss on *any* sale, exchange, or other disposition, or to substantiate deductions for *any* casualty loss.

Paragraph (c)(2) provides that in the timber *depletion accounts* (if and when established pursuant to paragraph (c)(1)) there shall be set up *separately quantities of timber*, land, and other resources, if any, "*after proper provision for immature timber growth.*" (Emphasis supplied.) It also provides that the charges to depletion accounts shall be credited to the (separate) timber accounts or to depletion reserve accounts, and that when the sum of the credits for depletion *equals* the cost or other *basis* (adjusted) of the *timber property*, no further deductions *for depletion* will be allowed. This merely says that if the amounts of the depletion allowances rise to the *equal* of the amount of the *adjusted basis for gain*, taxpayer will be allowed *no further deductions*

*for depletion*, because at that point his cost, adjusted, or capital will have been recovered through depletion allowances, leaving nothing at that point from which a depletion unit (rate) may be computed.[48] Taxpayer's capitalization of further plantations, e. g., will not, at that time, result in an increase in his basis for determining depletion, but it will result in an increase in his adjusted basis for determining (gain or) *loss*, which adjusted basis could be recovered in the proceeds of a taxable sale or from a deduction for casualty loss.

Paragraph (d)(1) provides that for purposes of *valuation* and *accounting*, *timber* shall be included in one or more accounts (set up according to (c)(2)), generally according to its identification as a *"block,"* *"[w]ith a view to logical and reasonable valuation of timber."* (Emphasis supplied.) Numerous *qualifications for determining "blocks"* are specified, including operation units logically related by close proximity to a single given point of manufacture, logging units defined by a single logging development for removing all of the timber in the logging unit where logs are to be sold in a log or other market or shipped a considerable distance to the point of manufacture, geographical boundaries, political boundaries, or *logical management areas.* The *division* of "blocks" is authorized, *for good and substantial reasons* and *subject to approval or revision by the district director.* Such reasons enumerated are time of acquisition, differences in species or groups of species, character of the timber, accessibility, and scattered nature of the separate tracts. *If* division of the block is made, a proper portion of the total value or cost shall be allocated to each account.

Paragraph (d)(2) provides that the timber accounts mentioned in (d)(1) shall not include any part of the land, but that *land in a given "block"* may similarly be carried in *two or more accounts on the basis of character or accessibility*, with appropriate allocation of value or cost.

---

**48.** Or, if you wish, "a numerator of zero divided by a denominator in any amount will produce a quotient of zero." Q.E.D., according to "old" math.

Paragraph (d)(3) makes specific the requirement that in any allocation of total value or cost there *shall be an equitable allocation to timber, to land, and to immature growth*; and that *when* the latter becomes *merchantable* such value or cost shall be *recoverable through depletion* allowances. This provision does *not* say that such cost shall be *recovered* "only" through depletion allowances. If it should never become appropriate to *allow* depletion, because, *e. g.*, of continued immaturity at the time of a taxable disposition of the tract, such allocation of basis will be recovered in the proceeds and not through depletion allowances.

Paragraph (d)(4) requires the location of accounts required by (c)(1) to be described by map or legal descriptions.

Paragraph (d)(5) provides for *further division or recombining of accounts for good and substantial reasons* upon approval or demand *by the district director.*

Paragraph (e) provides that if a *taxpayer* claims or *expects to claim depletion* it *must estimate* as of March 1, 1913, or other applicable date the *total number of units* (feet board measure, etc.) which the *area covered by the specific account* would have produced *if all of the merchantable timber had been cut,* based on local standards of utilization at that time. If at the close of any year the taxpayer or the district director ascertains that "there remain on the ground" more or less units than the original estimate, adjusted for subsequent growth, changes in standards of utilization, losses not accounted for, abandonment, operations, or development, then the original estimate, but *not the basis*[49] for depletion, shall be revised. However, the revision of the number of units in the denominator of the depletion rate formula *requires a revision in* such rate (unit) and that *depletion unit* is required to be used for the year of revision and all subsequent years until another revision is required. Thus, the ad-

justed basis for the logical and reasonable account or block of accounts is not an estimate but an equitable allocation of cost, which is a defined amount. The depletion unit is a variable rate, depending on estimates, within such account or block.

Paragraph (f) prescribes many factors taken into account in the valuation of timber property, all of which may or may not be utilized in appraisals of the timber in a particular region. They need not be paraphrased here because, although numerous, they are succinctly set forth in Appendix B for the purpose of determination of fair market value of "the property" at a specified rate as the basis for depletion deductions. Whether these factors are complete, or whether all are used by appraisers in the regions affected in this case is not for the court to say at this stage of the proceedings, but we would expect the experts in those regions, under present practices, to come up with the *same fair market value* on any given date, regardless of the purpose of the valuation.

Paragraph (g) provides that *no revaluation* of a timber property valued and approved as of a certain date will be made or allowed during continuance of the same ownership except for misrepresentation, fraud, or gross error and upon written approval of the Commissioner. Thus a proper valuation, *e. g.*, as of March 1, 1913, used as the original basis of timber property, and therefore the original basis for depletion, would, normally, as provided in paragraph (e), not be revised, even if the original estimate of *units* (or volume) of timber were revised. However, if grossly erroneous such valuation is revised with approval of the Commissioner, then the depletion unit (rate) must also be revised for use in the year of revision and all subsequent years. Obviously, this prohibition does not apply for the purpose of determining casualty losses, otherwise it would never be

---

**49.** Obviously because the basis for depletion is derived from the section 1011 adjusted basis which is derived from an allocation of the original cost, which remains the same regardless of the number of units estimated to be represent-

ed by such cost. Thus, the "identity" of the account or block and the identity of its section 1011 basis can remain the same while simple growth or error in estimation can change the "identity" of the depletion unit.

possible to ascertain the reduction in fair market value required by section 165(a).

Paragraph (h) prescribes 11 items of detailed information to be submitted on a prescribed form when claiming a deduction for depletion of timber, and includes a requirement for an express election under section 631(a) to treat cutting as a sale, and submission of information in support of the *fair market value* claimed, as the substitute for a sales or cost figure in the event of such election.[50]

The provisions relating to "involuntarily converted" property do not support defendant's position. Treasury Reg. § 1.1231–1(c) limits the application of section 1231, in the case of timber, to cases involving an *election* under section 631. Treasury Reg. § 1.631–1(a)(1) provides in effect that the "deemed sales proceeds of a deemed sale," pursuant to an *election* under section 631, is the *fair market value as standing timber* on the first day of the year of *cutting.* The difference between that fair market value and *actual cost or other basis* determines the (gain or) loss from a sale or exchange under section 1231.[51] Thus, section 631 merely creates a fictitious sale, and fictitious sales proceeds equal to a fair market value as standing timber. The offset against the fictitious gross proceeds is *actu-*

*al cost* or adjusted cost. The relationship, of this offset, to depletion derives from section 1012, not section 612 or 631. In any event, Treas.Reg. § 1.1231–1(e)(2) expressly provides that uncompensated casualty losses sustained during certain taxable years, including those here in issue, "are not losses to which section 1231(a) applies."

 This tedious but necessary journey through defendant's own regulations is sufficient in itself to show clearly that in the pattern of loss, basis, and depletion provisions, depletion is a derivative of basis. Basis occupies the superior position.[52]

We consider defendant's imposition of a fractional, *pro tanto*, or partial allowance of basis, advocated here and in *Rosenthal*, to be the equivalent of the "percentage of basis rule" advanced by defendant over a long period of years. The same conclusion by Judge Moore is contained in his dissent in *Rosenthal.*[53] We see no constructive purpose to be achieved in leading the reader again through a discussion of countless opinions and rulings published since *Whipple*[54] to show the rise and fall and rise again of the theory of a percentage limitation imposed on the full amount of any loss of capital contemplated by section 165 and its predecessors.[55] If *Rosenthal* and *Harper*

---

**50.** See Treas.Reg. §§ 1.631–1(a)(1), (c), (d)(1), and (e).

**51.** Subsequent (after the deemed sale) gain or loss from *actual* sale of the timber or timber products is determined under paragraph 1.631–1(e), where the *same fair market value as standing timber* (having been "subjected" to tax) becomes the "adjusted basis" which is allowed against the proceeds of actual sale as a measure of gain or loss.

**52.** Put otherwise, depletion is not in itself the star of the show. It is merely one of the expendable, equally billed bit players doing its own thing, gussied up in its own regulation ribbons of red tape, dancing around the May queen of basis. Depletion and the other deductions act out their parts in a periphery. Basis reigns in a spotlight emphasis that leaves no doubt as to where the rose is pinned.

**53.** 416 F.2d at 507. The majority opinion in *Rosenthal v. Commissioner, supra* note 31, has been widely criticized in the legal periodicals commenting on the case. See *Taxation—Fed-*

*eral Income Tax—Deduction for Casualty Loss —Taxpayer's Basis for Limiting Casualty Deduction for Damage to Part of Timber Tract Is Equal to Depletion Allowance for Trees Damaged and Not to Basis for Entire Tract,* 83 Harv.L.Rev. 478 (1969); *Federal Income Tax— Casualty Loss Deduction—Determining the Proper Basis Figure in a Partial Casualty Loss to a Timber Tract—What Is the Single, Identifiable Property Damaged or Destroyed, the Trees or the Entire Tract?,* 1 Loy.Chi.L.J. 372 (summer 1970); *Federal Income Taxation—Casualty Loss-Adjusted Basis Used to Compute Casualty Loss Deduction for Partially Destroyed Timber Tract Computed According to Depletion Deduction Formula,* 4 Ga.L.Rev. 212 (fall 1969).

**54.** *Whipple v. United States, supra* note 16.

**55.** *See, e. g., Helvering v. Owens,* 305 U.S. 468, 59 S.Ct. 260, 83 L.Ed. 292 (1939); *Alcoma Ass'n v. United States,* 239 F.2d 365 (5th Cir. 1956); *United States v. Koshland,* 208 F.2d 636 (9th Cir. 1953); *Knapp v. Commissioner,* 23

have breathed life into the corpse laid out in *Alcoma*, the different and more comprehensive facts of the instant case compel us to agree with the conclusions of Judge Tuttle:[56]

> If this were entirely a matter of first impression it could certainly be said that nothing in the pertinent statutory provisions *directly* supports the Commissioner's attempt to limit allowable loss in case of the partial destruction of business property to a fraction of the adjusted basis rather than to the full amount of the adjusted basis. Even granting that the allowance of any deductions is a matter of legislative grace, where the statute explicitly provides for one the Commissioner cannot cut it down without specific statutory authority. Nor, as discussed further below, are we impressed either by the arguments by analogy from the computations applicable to partial sales, or by the policy grounds suggested, that the Commissioner's formula follows from the statutory pattern of the revenue codes by logical implication. [Emphasis in original.]

This court on a previous occasion has considered the relationship between the loss and basis provisions and held that where the parties stipulated that timber had *no* basis, no deduction for casualty loss could be allowed because of the limitation of section 165(b).[57] Our conclusions today are not in conflict with that earlier opinion, in which both *Rosenthal* and *Alcoma* were cited as authority.

### B. *Identifying THE Property*

Defendant has consistently contended that the "single, identifiable property," in the case of timber, is a unit (of board feet in the case of sawtimber or of cords in the case of pulpwood) of merchantable timber contained in the merchantable trees suffering mortal injury, and that the allowable deduction is limited to the adjusted bases of these units as carried in the depletion accounts in amounts not disputed by either party.

Although defendant's identification of "the property" presents an easy and convenient solution, it is defective in that it does not always comport with the full facts, and, furthermore, it operates to exclude any deduction for some economic losses due to casualties to timber that may actually have been incurred. This can operate in a way that leaves the taxpayer with a basis allocated to property that no longer exists. Defendant's more fundamental error, as we have shown, is that it has reversed the intended scheme and pattern of the statute and regulations to permit the tail of depletion to wag the dog of basis. The facts that plaintiff has the burden of proving the identity of the property, its fair market values, its adjusted basis, and the nature and extent of the damage and destruction, and that such burden may be "burdensome" or even impossible, are not grounds for foreclosing plaintiff its opportunity to attempt to meet that burden.[58] Plaintiff is entitled to prove, if it can, its actual net "economic advance or setback" for the taxable period. Taxable income, not computational inconvenience, is the objective of the tax.

From the time of filing its returns for the periods involved, plaintiff's primary contention has been that the single, identifiable property is the timber in the timber tract, *i. e.*, in the respective woodlands, exclusive of the land, and that it is the adjusted basis of the timber in each woodlands that constitutes the limit, if any, on the deduction of

T.C. 716 (1955); *Krome v. Commissioner, supra* note 20; *Grant v. Commissioner, supra* note 22; *Frazer v. Commissioner*, 10 B.T.A. 409 (1928).

**56.** *Alcoma Ass'n v. United States, supra* note 55, 239 F.2d at 367.

**57.** *Ward v. United States, supra* note 19, 192 Ct.Cl. at 715, 428 F.2d at 1291.

**58.** " * * * The conditions contained for the loss deduction * * * must be established by the taxpayer, on whom the burden rests. [Footnotes omitted.] * * * " Mertens, Law of Federal Income Taxation, Code Commentary § 165:2 (1980).

the amount of loss suffered by the timber in that woodland. If not the woodlands, plaintiff asserts, then the single property is an area defined by the depletion district; and, if neither the woodlands nor the depletion district, plaintiff here asserts an alternative claim based on the single property being the trees affected, i. e., destroyed or injured in the damaged area.

Section 611(a) of the code imposes on the Treasury, as a guideline for prescribing regulations for a "reasonable allowance for depletion," "the peculiar conditions in each case." The Treasury leans heavily on these "peculiar conditions in each case" in prescribing the rules for establishing "blocks" as a logical and reasonable unit for purposes of valuation and accounting.[59]

The logic and reason behind establishment of "blocks" for the purpose of valuation are the same factors that sensibly define the property for purposes of determining casualty loss (an exercise in valuation) and adjusted basis (an exercise in accounting).

 As Judge Moore indicated,[60] natural disasters that befall timber do not impact upon stacked cords of logs or board feet of timber except perhaps in a lumberyard.[61] Thus the single, identifiable *property damaged* by the casualty *is the standing timber*, merchantable and nonmerchantable, *in an affected area*. Only a *potential* for cords and board feet is damaged or destroyed, even in merchantable trees, and those "single" trees have no adjusted basis. Trees contain only an estimated and everchanging *volume* of merchantable timber,

the value of which is merely a factor in determining the value of *all* of the timber in an area or block. The "cost" of the tree changes from year to year, depending on its growth and upon an annual estimate of volume as well as an imposition of accounting adjustments to the basis of the block. The only unit which remains constant and identifiable and has a cost or adjusted basis that is not changed except by elimination of an asset or by an injection of capital is the block. The disasters that affected four blocks, or "districts" of plaintiff's Southern Woodlands, did not affect the other six. The code and regulations require that such losses be reflected in the adjustments to basis of each of the timber accounts in those four districts. The resulting "adjusted basis for determining the gain" on sale, exchange or other disposition of each district, exclusive of the land, will be the basis for adjusting the depletion rate or rates for the year of the casualty, in the account reflecting the immature growth and all other timber accounts in the block. Thus the block (or district if they are the same, as they appear from the stipulation of facts to be) remains constantly identifiable as a unit of property, having an identifiable adjusted basis unaffected by other such units, and, in the case of this plaintiff, a reasonable and logical and *identifiable* area affected by the casualty.

Cords and board feet are not the units of property normally bought and sold by plaintiff. It buys tracts of timber, not primarily for resale, but to supply pulp to its own mills.

---

**59.** Treasury Reg. §§ 1.611–3(d), (e), and (f), reproduced in Appendix B, and our analysis, *supra*.

**60.** *Rosenthal v. Commissioner, supra* note 31, 416 F.2d at 501.

**61.** A passing hurricane could very well leave a timber tract looking like the north slope of Mount St. Helens. On the other hand, the acknowledged devilish antics of tornadoes not only raise a question of attribution in use of the term "Act of God," but might have a more selective impact than hurricanes, fires, and freezes. The late Judge J. Gilmer Korner, Jr., enjoyed recounting a boyhood experience of seeing a tornado approach his hometown, de-

stroy one of its churches, skip over the red light district, and demolish a church on the other side of town. Conceivably this skittish characteristic of tornadoes could result in a selective extraction of all of the merchantable timber in a tract, conversion of it to logs of uniform length, and deposit of the same, neatly stacked, at some distant unknown location. More likely this result is a fantasy that so far has been depicted only in "Peanuts," when the cat next door slashed Snoopy's doghouse, and in Thimble Theater where the irresistible force of Popeye's fist, fortified by a diet of spinach, smashes into an immovable object.

In its planning, the goal of plaintiff and others in the forest products industry is to produce an adequate supply of merchantable timber for the indefinite future, and *the value of timberlands depends in large part on the land's ability to provide a sustained yield.*

A typical timber track or forest, as a living biological entity, consists of mature merchantable trees containing timber currently saleable at its full harvest potential, younger merchantable trees whose timber is not currently saleable at its full harvest potential, and young growth and other non-depletable and nonmerchantable timber. As trees grow from seedlings, many eventually produce sufficient marketable wood to become merchantable trees. The volume of merchantable timber contained in such trees is then entered into a depletion account. As trees continue to grow after first becoming merchantable, additional merchantable timber accrues annually. In time these trees will be harvested.

Plaintiff groups its timberlands into management units, which it calls woodlands. Involved in this case are its Southern Woodlands and North Carolina Woodlands. Each woodlands has as its top administrative officer a woodlands manager with responsibility for planning the future development of the tract, sales of stumpage, logging, protection of the tract against fire and trespassers, property tax administration, and preparation of accounting details. Where the administrative requirements of a given woodlands warrant, the woodlands is divided into several depletion districts in accordance with Treas.Reg. § 1.611–3(d).[62]

Southern Woodlands, continuously owned by plaintiff during its taxable years 1959 through 1963, and so owned at the time this action was filed, consists of approximately 500,000 acres of timberland in Georgia and South Carolina. Plaintiff's timberlands in the South Carolina portion of the woodlands consisted of at least 65 separately named units ranging in size from 626 acres to 14,165 acres. These units are, for the most part, not contiguous to each other.

Most units are made up of a number of smaller parcels of land, often referred to as "tracts." These tracts generally represent the units in which the timberland was purchased by plaintiff. Many of these tracts are not contiguous and many of them were acquired separately. The units and tracts contain trees of varying species and ages. Purchases of timberland for the creation of the Southern Woodlands began in the early 1930's in anticipation of a mill facility which was built and was located in Charleston, South Carolina, about 1936. Purchases have continued since then to meet the requirements of the mill.

North Carolina Woodlands consisted of approximately 300,000 acres, was continuously owned by plaintiff during the taxable years in issue, and was completely disposed of in the taxable year 1973. This property consisted of an almost contiguous area of timberlands, separated mainly by natural water boundaries, and almost all of which was purchased during 1952 and 1953 from two sellers. The woodlands were purchased in anticipation of a mill facility to be built in North Carolina. During the 1960's it was decided to build a new mill in Kentucky instead, resulting in a decision in the early 1970's to dispose of the property.

For depletion purposes, during the years in issue, North Carolina Woodlands consisted of a single depletion district during the entire period, and through the time of its complete disposition. The Southern Woodlands was divided pursuant to the regulations into 10 districts, each consisting of a number of units. Each district of Southern Woodlands was headed by a district forester under the supervision of the woodlands manager.

Presumably the restructure into districts of the many tracts purchased by plaintiff conformed to normal industry practice and was made for "good and substantial reasons," and with the prescribed approval of the district director, for the district director has never revised them as he is empowered to do. North Carolina Woodlands was sold

---

**62.** Treasury Reg. § 1.611–3(d) (1976), reproduced in Appendix B.

in 1973 in its restructured single district form.

It is at least as "logical and reasonable" to assume that the present subdivided district structure of Southern Woodlands represents the present assembly of single, identifiable properties that plaintiff might sell and a purchaser might buy, rather than one of the dozens of smaller tracts originally assembled by plaintiff. These districts were set up not only in accordance with the considerations imposed by Treas.Reg. § 1.611–3(d), but also on the basis of effective forestry operation and management. They have become the single properties to each of which there has been an allocation of original cost from which can be ascertained a definite and complete adjusted basis for determining *loss* from the sale or other disposition of property. That adjusted basis is the same amount, in this case, as the adjusted basis for determining *gain*, that controls the amount of the rate in the depletion unit or units represented in the account or accounts within the block or district. An economical division of the district, with a parallel division of adjusted basis, is not practicable except in terms of its appropriate composite accounts. Those divisions will account for plaintiff's full adjusted basis. A subdivision by merchantable trees, or by merchantable units contained in trees, totally excludes portions of plaintiff's basis, as, *e. g.*, the required allocation to immature growth. Plaintiff is entitled to recover the basis in this unmerchantable timber whether it is sold along with the district tract, or destroyed by casualty affecting that tract.

Defendant is correct in arguing that plaintiff may not "borrow" basis from unharmed property to increase the deduction. No such basis is "borrowed" unless the merchantable unit destroyed is considered the only acceptable single, identifiable property. To accept that view results in a "borrow-ing" of the basis of the property damaged *but not destroyed, with a consequent unwarranted decrease* in the deduction that is *allowable* for damage *or* destruction.[63]

Nowhere in the code, nor in the regulations, is "property" sufficiently defined. It is defined in the general regulations[64] covering allowance of a deduction for depletion as follows:

(d) *Definitions.* As used in this part, and the regulations thereunder, the term—

 (1) "Property" means—* * * (ii) in the case of timber, an economic interest in standing timber in each tract or block representing a separate timber account * * *.

 * * * * * *

Whatever ambiguity may be contained in this definition with respect to its application to determination of "the single, identifiable property damaged or destroyed," referred to in Treas.Reg. § 1.165–7(b)(2)(i),[65] we are constrained to observe that the "cutting" that brings into play the depletion provisions must be imposed on *standing timber in each tract or block.* This cutting uses up a part of taxpayer's adjusted basis in the timber, but only that part that has been allocated to a depletion unit. On the other hand, it is damage or destruction caused by casualty that brings into play the loss provisions. The parties agree that "timber" includes more than merchantable wood.[66] As we have seen, the depletion regulations use the word "property" or term "timber property" in the sense of the "standing timber in each tract or block" contained in the definition, *supra*.[67] This compels a conclusion that the single, identifiable property bearing the damage or destruction is the *standing timber in each tract or block.* This is not only the identifiable property suffering the damage or destruction, it is the property with an identifiable adjusted *basis for determining loss.*

---

63. On this scale of justice, neither party may weigh the thumb of borrowed basis.

64. Treasury Reg. § 1.611–1(d)(1)(ii) (1976).

65. Appendix A.

66. Note 4, *supra.*

67. Treasury Reg. §§ 1.611–3(c)(1) and (2), (f)(1), (g), reproduced in Appendix B.

The block reflects the *full* extent of the economic loss measured by a reduction in value; the depletion unit does not. The identifiable, adjusted basis of the block limits the deduction for that full loss to that portion of the loss equal to taxpayer's adjusted cost of the standing timber in the block; the depletion unit imposes an additional, illegal limitation, by ignoring taxpayer's existing adjusted cost in the nonfatally injured portions of the standing timber in the block which undestroyed but damaged timber represented a part of its value at the time of the casualty.

The failure of taxpayer in *Rosenthal* to allocate basis to anything but merchantable units was a factor in leading the Tax Court to find that the reduction in value of the tract was the same as the reduction in value of destroyed merchantable units. Neither the second circuit in *Rosenthal* nor the fourth circuit in *Harper* truly had the issue of nonfatal injury to timber before it. The issue was excluded by the facts in the former and by the framing of the issues and failure of proof in the latter. The comprehensive facts of the instant case do not permit us to reach the same result.

We hold that the single, identifiable property damaged or destroyed in the case of this plaintiff was all of the standing timber in the area of the individual district directly affected by each casualty.

### III.

#### Anticipation of Income

As its remaining defense, defendant complains that to sustain plaintiff's formula here would be to allow plaintiff to take a casualty loss deduction against anticipated profits from the appreciation of its property for which it has paid no taxes. Yet part of the appreciation will result from the future maturity of young growth which must, under defendant's regulations, be allocated a portion of cost or value in anticipation of such future income. That potential can, therefore, have a present value that can be destroyed or damaged. The

fact that trees may be "nonmerchantable," in the sense that they are not of a size to produce timberlogs or sawtimber, does not mean that they contribute no fair market value to the tract, or have no basis in themselves.

When Treas.Reg. § 1.165–7(b)(1)(i) is invoked in attempting to measure plaintiff's casualty loss, the fact that the fair market criterion may reflect some untaxed income does not invalidate such a formula. As the fifth circuit said in *Alcoma*: [68]

> Finally the Commissioner objects that the taxpayer's formula in effect allows him to take losses against anticipated profits from the appreciation of his property, for which he has as yet paid no taxes. This argument is deceptive. The only *real* amount is the out-of-pocket loss suffered by the taxpayer; this loss might indeed be larger than otherwise because of the (as yet untaxed) appreciation in the value and cost of the property, but it is nevertheless a real loss. This loss can in any event be deducted only to the extent of the original investment reduced by the previously allowed depreciation. The appreciation can still be taxed when and if actually realized; if the property should later depreciate before it is sold it is the taxpayer who is ultimately injured by having suffered his loss at the time when prices and presumably replacement costs were high—he should not be penalized taxwise because he "realized" his "profits" through involuntary conversion at a time when prices happen to be high. [Emphasis in original.]

We do not perceive an income method of valuation as an anticipation of income. It is premature for us to judge the validity of plaintiff's formula. The basic query here is the "loss sustained." That is a matter of valuation. In fact, use of projected income is one of the basic, and quite often the preferred, of the three generally accepted methods of valuation. Presumably it is an accepted method of valuation of timberlands, but establishment of that fact is a

---

**68.** *Alcoma Ass'n v. United States, supra* note 55, 239 F.2d at 370.

part of plaintiff's burden of proof, to which defendant no doubt will respond with its own expert testimony.[69] The present state of the record is not such that we can ascertain the reduction in fair market value of any of the affected districts. We remand that issue to the trial division. When determined, the reduction will measure the full casualty loss to the affected district. The determination of the limitation on allowance of a deduction for those losses will then be a simple matter of referring to the adjusted basis of each affected district.

## CONCLUSION

On the basis of the foregoing, we conclude that the method used by defendant is erroneous and we deny defendant's motion for summary judgment. Further, we conclude that each of plaintiff's management districts constitutes a single, identifiable property for determining the full amount of the casualty losses sustained by plaintiff and for determining the limitation on the allowance for deduction of such losses under section 165 of the code, and we grant plaintiff's cross-motion for summary judgment to that extent; but since plaintiff has not as yet established the difference in fair market values of each of the various affected management districts immediately before and immediately after the respective casualties, we deny plaintiff's motion to that extent. The case is remanded to the trial division for further proceedings in accordance with this opinion.

## APPENDIX A

Treasury Reg. § 1.165–7 (1976), "Casualty losses," provides in part as follows:

(a) *In general*— (1) *Allowance of deduction.* Except as otherwise provided in paragraphs (b)(4) and (c) of this section, any loss arising from fire, storm, shipwreck, or other casualty is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. However, see § 1.165–6, relating to farming losses, and § 1.165–11, relating to an election by a taxpayer to deduct disaster losses in the taxable year immediately preceding the taxable year in which the casualty occurred. The manner of determining the amount of a casualty loss allowable as a deduction in computing taxable income under section 63 is the same whether the loss has been incurred in a trade or business or in any transaction entered into for profit, or whether it has been a loss of property not connected with a trade or business and not incurred in any transaction entered into for profit. The amount of a casualty loss shall be determined in accordance with paragraph (b) of this section. For other rules relating to the treatment of deductible casualty losses, see § 1.1231–1, relating to the involuntary conversion of property.

(2) *Method of valuation.* (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.

(ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (*a*) the repairs are necessary to restore the property to its condition immediately before the casualty, (*b*) the amount spent for such repairs is not excessive, (*c*) the repairs do not care for more than the damage suffered, and (*d*) the value of the property after the repairs does not as

---

**69.** It is not likely that either party will take the position of the Georgia farmer, in circumstances similar to plaintiff's, that "[t]he fair market value just before the hurricane was zero. Who'd buy a farm in the path of a hurricane?"

Lempert, *Wolfe: The Tax Man Never Forgot People*, a reminiscence of Singleton B. Wolfe, reported at II Legal Times of Washington No. 46, Apr. 21, 1980, at 6.

a result of the repairs exceed the value of the property mmediately before the casualty.

\* \* \* \* \* \*

(b) *Amount deductible.* (1) *General rule.* In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for the purposes of section 165(a) shall be the lesser of either—

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved. However, if property used in a trade or business or held for the production of income is totally destroyed by casualty, and if the fair market value of such property immediately before the casualty is less than the adjusted basis of such property, the amount of the adjusted basis of such property shall be treated as the amount of the loss for purposes of section 165(a).

(2) *Aggregation of property for computing loss.* (i) A loss incurred in a trade or business or in any transaction entered into for profit shall be determined under subparagraph (1) of this paragraph by reference to the single, identifiable property damaged or destroyed. Thus, for example, in determining the fair market value of the property before and after the casualty in a case where damage by casualty has occurred to a building and ornamental or fruit trees used in a trade or business, the decrease in value shall be measured by taking the building and trees into account separately, and not together as an integral part of the realty, and separate losses shall be determined for such building and trees.

(ii) In determining a casualty loss involving real property and improvements thereon not used in a trade or business or in any transaction entered into for profit, the improvements (such as buildings and ornamental trees and shrubbery) to the property damaged or destroyed shall be considered an integral part of the property, for purposes of subparagraph (1) of this paragraph, and no separate basis need be apportioned to such improvements.

## APPENDIX B

Treasury Reg. § 1.611–3 (1976), "Rules applicable to timber," reads as follows:

(a) *Capital recoverable through depletion allowance in case of timber.* In general, the capital remaining in any year recoverable through depletion allowances is the basis provided by section 612 and the regulations thereunder. For the method of determining fair market value and quantity of timber, see paragraphs (d), (e), and (f) of this section. For capitalization of carrying charges, see section 1016(a)(1)(A). Amounts paid or incurred in connection with the planting of timber (including planting for Christmas tree purposes) shall be capitalized and recoverable through depletion allowances. Such amounts include, for example, expenditures made for the preparation of the timber site for planting or for natural seeding and the cost of seedlings. The apportionment of deductions between the several owners of economic interests in standing timber will be made as provided in paragraph (c) of § 1.611–1.

(b) *Computation of allowance for depletion of timber for taxable year.* (1) The depletion of timber takes place at the time timber is cut, but the amount of depletion allowable with respect to timber that has been cut may be computed when the quantity of cut timber is first accurately measured in the process of exploitation. To the extent that depletion is allowable in a particular taxable year with respect to timber the products of which are not sold during such year, the depletion so allowable shall be included as an item of cost in the closing inventory of such products for such year.

(2) The depletion unit of the timber for a given timber account in a given year shall be the quotient obtained by dividing (i) the basis provided by section 1012 and adjusted as provided by section 1016, of the timber on hand at the beginning of the year plus the cost of the number of units of timber acquired during the year plus proper additions to capital, by (ii) the total number of units of timber on hand in the given account at the beginning of the year plus the number of units acquired during the year plus (or minus) the number of units required to be added (or deducted) by way of correcting the estimate of the number of units remaining available in the account. The number of units of timber of a given timber account cut during any taxable year multiplied by the depletion unit of that timber account applicable to such year shall be the amount of depletion allowable for the taxable year. Such amount shall be charged to a depletion account which shall be credited as the timber, with respect to which the charge was made, is sold. Those taxpayers who keep their accounts on a monthly basis may, at their option, keep their depletion accounts on such basis, in which case the amount allowable on account of depletion for a given month will be determined in the manner outlined herein for a given year. The total amount of the allowance for depletion in any taxable year shall be the sum of the amounts allowable for the several timber accounts. For a description of timber accounts, see paragraphs (c) and (d) of this section.

(3) When a taxpayer has elected to treat the cutting of timber as a sale or exchange of such timber under the provisions of section 631(a), he shall reduce the timber account containing such timber by an amount equal to the adjusted depletion basis of such timber. In computing any further gain or loss on such timber, see paragraph (e) of § 1.631-1.

(c) *Timber depletion accounts on books.* (1) Every taxpayer claiming or expecting to claim a deduction for depletion of timber property shall keep accurate ledger accounts in which shall be recorded the cost

or other basis provided by section 1012 of the property and land together with subsequent allowable capital additions in each account and all other adjustments provided by section 1016 and the regulations thereunder.

(2) In such accounts there shall be set up separately the quantity of timber, the quantity of land, and the quantity of other resources, if any, and a proper part of the total cost or value shall be allocated to each after proper provision for immature timber growth. See paragraph (d) of this section. The timber accounts shall be credited each year with the amount of the charges to the depletion accounts computed in accordance with paragraph (b) of this section or the amount of the charges to the depletion accounts shall be credited to depletion reserve accounts. When the sum of the credits for depletion equals the cost or other basis of the timber property, plus subsequent allowable capital additions, no further deduction for depletion will be allowed.

(d) *Aggregating timber and land for purposes of valuation and accounting.* (1) With a view to logical and reasonable valuation of timber, the taxpayer shall include his timber in one or more accounts. In general, each such account shall include all of the taxpayer's timber which is located in one "block." A block may be an operation unit which includes all the taxpayer's timber which would logically go to a single given point of manufacture. In those cases in which the point of manufacture is at a considerable distance, or in which the logs or other products will probably be sold in a log or other market, the block may be a logging unit which includes all of the taxpayer's timber which would logically be removed by a single logging development. Blocks may also be established by geographical or political boundaries or by logical management areas. Timber acquired under cutting contracts should be carried in separate accounts and shall not constitute part of any block. In exceptional cases, provided there are good and substantial reasons, and subject to approval or revision by the district director on audit, the taxpayer may divide the timber in a given block

into two or more accounts. For example, timber owned on February 28, 1913, and that purchased subsequently may be kept in separate accounts, or timber owned on February 28, 1913, and the timber purchased since that date in several distinct transactions may be kept in several distinct accounts. Individual tree species or groups of tree species may be carried in distinct accounts, or special timber products may be carried in distinct accounts. Blocks may be divided into two or more accounts based on the character of the timber or its accessibility, or scattered tracts may be included in separate accounts. If such a division is made, a proper portion of the total value or cost, as the case may be, shall be allocated to each account.

(2) The timber accounts mentioned in subparagraph (1) of this paragraph shall not include any part of the value or cost, as the case may be, of the land. In a manner similar to that prescribed in subparagraph (1) of this paragraph, the land in a given "block" may be carried in a single land account or may be divided into two or more accounts on the basis of its character or accessibility. When such a division is made, a proper portion of the total value or cost, as the case may be, shall be allocated to each account.

(3) The total value or total cost, as the case may be, of land and timber shall be equitably allocated to the timber and land accounts, respectively. In cases in which immature timber growth is a factor, a reasonable portion of the total value or cost shall be allocated to such immature timber, and when the timber becomes merchantable such value or cost shall be recoverable through depletion allowances.

(4) Each of the several land and timber accounts carried on the books of the taxpayer shall be definitely described as to their location on the ground either by maps or by legal descriptions.

(5) For good and substantial reasons satisfactory to the district director, or as required by the district director on audit, the timber or the land accounts may be readjusted by dividing individual accounts, by combining two or more accounts, or by dividing and recombining accounts.

(e) *Determination of quantity of timber.* Each taxpayer claiming or expecting to claim a deduction for depletion is required to estimate with respect to each separate timber account the total units (feet board measure, log scale, cords, or other units) of timber reasonably known, or on good evidence believed, to have existed on the ground on March 1, 1913, or on the date of acquisition of the property, whichever date is applicable in determining the basis for cost depletion. This estimate shall state as nearly as possible the number of units which would have been found present by careful estimate made on the specified date with the object of determining 100 percent of the quantity of timber which the area covered by the specific account would have produced on that date if all of the merchantable timber had been cut and utilized in accordance with the standards of utilization prevailing in that region at that time. If subsequently during the ownership of the taxpayer making the return, as the result of the growth of the timber, of changes in standards of utilization, of losses not otherwise accounted for, of abandonment of timber, or of operations or development work, it is ascertained either by the taxpayer or the district director that there remain on the ground, available for utilization, more or less units of timber at the close of the taxable year (or at the close of the month if the taxpayer keeps his depletion accounts on a monthly basis) than remain in the timber account or accounts on the basis of the original estimate, then the original estimate (but not the basis for depletion) shall be revised. The depletion unit shall be changed when such revision has been made. The annual charge to the depletion account with respect to the property shall be computed by using such revised unit for the taxable year for which the revision is made and all subsequent taxable years until a change in facts requires another revision.

(f) *Determination of fair market value of timber property.* (1) If the fair market value of the property at a specified date is

the basis for depletion deductions, such value shall be determined, subject to approval or revision by the district director upon audit, by the owner of the property in the light of the most reliable and accurate information available with reference to the condition of the property as it existed at that date, regardless of all subsequent changes, such as changes in surrounding circumstances, and methods of exploitation, in degree of utilization, etc. Such factors as the following will be given due consideration:

(i) Character and quality of the timber as determined by species, age, size, condition, etc.;

(ii) The quantity of timber per acre, the total quantity under consideration, and the location of the timber in question with reference to other timber;

(iii) Accessibility of the timber (location with reference to distance from a common carrier, the topography and other features of the ground upon which the timber stands and over which it must be transported in process of exploitation, the probable cost of exploitation and the climate and the state of industrial development of the locality); and

(iv) The freight rates by common carrier to important markets.

(2) The timber in each particular case will be valued on its own merits and not on the basis of general averages for regions; however, the value placed upon it, taking into consideration such factors as those mentioned in this paragraph, will be consistent with that of other similar timber in the region. The district director will give weight and consideration to any and all facts and evidence having a bearing on the market value, such as cost, actual sales and transfers of similar properties, the margin between the cost of production and the price realized for timber products, market value of stock or shares, royalties and rentals, valuation for local or State taxation, partnership accountings, records of litigation in which the value of the property has been involved, the amount at which the property may have been inventoried or appraised in probate or similar proceedings, disinterested appraisals by approved methods, and other factors.

(g) *Revaluation of timber property not allowed.* No revaluation of a timber property whose value as of any specific date has been determined and approved will be made or allowed during the continuance of the ownership under which the value was so determined and approved, except in the case of misrepresentation or fraud or gross error as to any facts known on the date as of which the valuation was made. Revaluation on account of misrepresentation or fraud or such gross error will be made only with the written approval of the Commissioner. The depletion unit shall be revised when such a revaluation of a timber property has been made and the annual charge to the depletion account with respect to the property shall be computed by using such revised unit for the taxable year for which such revision is made and for all subsequent taxable years.

(h) *Information to be furnished by taxpayer claiming depletion of timber.* A taxpayer claiming a deduction for depletion of timber and for depreciation of plant and other improvements shall attach to his income tax return a filled-out Form T–Timber for the taxable year covered by the income tax return, including the following information:

(1) A map where necessary to show clearly timber and land acquired, timber cut, and timber and land sold;

(2) Description of, cost of, and terms of purchase of timberland or timber, or cutting rights, including timber or timber rights acquired under any type of contract;

(3) Profit or loss from sale of land, or timber, or both;

(4) Description of timber with respect to which claim for loss, if any, is made;

(5) Record of timber cut;

(6) Changes in each timber account as a result of purchase, sale, cutting, reestimate, or loss;

(7) Changes in improvements accounts as the result of additions to or deductions

from capital and depreciation, and computation of profit or loss on sale or other disposition of such improvements;

(8) Operation data with respect to raw and finished material handled and inventoried;

(9) Statement as to application of the election under section 631(a) and pertinent information in support of the fair market value claimed thereunder;

(10) Information with respect to land ownership and capital investment in timberland; and

(11) Any other data which will be helpful in determining the reasonableness of the depletion or depreciation deductions claimed in the return.

## APPENDIX C

Treasury Reg. § 1.165–1, "Losses," (1976), provides in part as follows:

(a) *Allowance of deduction.* Section 165(a) provides that, in computing taxable income under section 63, any loss actually sustained during the taxable year and not made good by insurance or some other form of compensation shall be allowed as a deduction subject to any provision of the internal revenue laws which prohibits or limits the amount of the deduction. This deduction for losses sustained shall be taken in accordance with section 165 and the regulations thereunder. For the disallowance of deductions for worthless securities issued by a political party, see § 1.271–1.

(b) *Nature of loss allowable.* To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165–11, relating to disaster losses, actually sustained during the taxable year. Only a bona fi[d]e loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

(c) *Amount deductible.* (1) The amount of loss allowable as a deduction under section 165(a) shall not exceed the amount prescribed by § 1.1011–1 as the adjusted basis for determining the loss from the sale or other disposition of the property involved. In the case of each such deduction claimed, therefore, the basis of the property must be properly adjusted as prescribed by § 1.1011–1 for such items as expenditures, receipts, or losses, properly chargeable to capital account, and for such items as depreciation, obsolescence, amortization, and depletion, in order to determine the amount of loss allowable as a deduction. To determine the allowable loss in the case of property acquired before March 1, 1913, see also paragraph (b) of § 1.1053–1.

(2) The amount of loss recognized upon the sale or exchange of property shall be determined for purposes of section 165(a) in accordance with § 1.1002–1.

(3) A loss from the sale or exchange of a capital asset shall be allowed as a deduction under section 165(a) but only to the extent allowed in section 1211 (relating to limitation on capital losses) and section 1212 (relating to capital loss carrybacks and carryovers), and in the regulations under those sections.

(4) In determining the amount of loss actually sustained for purposes of section 165(a), proper adjustment shall be made for any salvage value and for any insurance or other compensation received.

DAVIS, Judge, concurring in the result:

In this case it is agreed by all that (a) plaintiff suffered an actual and measurable loss from injuries to non-merchantable timber (as well as from injuries to merchantable timber), and (b) plaintiff had allocated a portion of its timber basis to the non-merchantable growth that suffered such casualty injuries. On these facts I agree—in general for the reasons given in Judge Smith's opinion—with the court's conclusions both that each of plaintiff's management districts constitutes a single, identifiable property for determining the full amount of the casualty losses as well as for determining the limitation on allowance of the deduction for such losses, and also that the case must be remanded to the Trial Division for proof of the difference in fair market value of

each of the affected districts before and after the respective casualties.

However—and this is primarily why I write separately—I do not believe that our result, on these facts, conflicts with the holdings in *Rosenthal v. Commissioner*, 416 F.2d 491 (2d Cir. 1969) or *Harper v. United States*, 396 F.2d 223 (4th Cir. 1968), or that we need or should criticize or disavow those holdings on the different facts which those two courts considered they had before them. In both of those instances, unlike the present case, the Courts of Appeals found or assumed that the taxpayers had proved no loss from injuries to non-merchantable timber and also that the taxpayers had allocated no part of their basis to such non-merchantable growth. It was in the light of those significantly different facts that those courts reached their different conclusions and it is in the light of those dissimilar facts that I am unwilling to say now that those courts were necessarily wrong, or to give any definitive view on such a separate case.

The *Rosenthal* opinion stresses that the taxpayers there had "not even attempted to assign a dollar amount to [the non-merchantable] loss" but had "estimated the whole amount of their claimed loss (approximately $130,000) solely in terms of the board feet of timber actually destroyed." 416 F.2d at 498. The court then said that "we must conclude that the taxpayers have failed to show any loss to the remainder of their tract." *Ibid.* The court also emphasized that the taxpayers had no basis in the non-merchantable growth and therefore were barred from complaining that they were not allowed a casualty loss for that type of growth. 416 F.2d at 498–99. *See also* 416 F.2d at 494–95, n.9.[1] My under-

standing of the majority opinion is that its conclusion took serious account of those specific facts of that case, and accordingly treated the casualty loss there (which the court said affected only merchantable timber, *i. e.* depletable timber) as if only cords or boards of merchantable wood were involved. In those limited circumstances it may well be (we need not decide) that the basis for casualty loss purposes can be the same as the basis derived from use of the depletion rate for merchantable timber.[2]

For these reasons I distinguish *Rosenthal* and *Harper* on the ground of the critically different fact-situations with which those courts dealt. Our case is substantially dissimilar—in that here there was a proved loss to non-merchantable, non-depletable growth and a basis allocated to that type of growth—and, even if the 2nd and 4th circuits were right on their particular facts, we can properly reach a different result without trenching on or censuring the other courts' holdings.

---

1. It is not part of my function, as I see it, to decide whether or not the court was right or wrong in its determination of the facts. I have to accept the facts on which the majority of the court made its ruling.

2. The earlier circuit court opinion in *Harper* is a very short *per curiam*, but the court did take pains to note that the taxpayers had failed to show that the storm damage would in any way affect the marketability of the remaining trees.

396 F.2d at 224. The *Rosenthal* opinion pointed out that, like the *Rosenthal* taxpayers, the *Harper* taxpayers had estimated the amount of their loss solely in terms of the amount and value of the timber actually destroyed and did not assign any dollar amount to any alleged loss of the timber remaining on the tract. The 2nd Circuit treated *Harper* as parallel in its facts to *Rosenthal*. 416 F.2d at 499.