Michael J. SCULLY and Peter D. Scully, as Trustees of the Paula Alyce Scully Trust, John Frederick Scully Trust, David Lewis Scully Trust, Merida Jane Scully Trust, Richard Peter Scully Trust, Nadine Gay Scully Trust, and Kirsten Maya Scully Trust, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

No. 84–3053.

United States District Court, C.D. Illinois, Springfield Division.

March 14, 1986.

Loren E. Johl, Robert A. Malstrom, Sidley & Austin, Chicago, Ill., for plaintiffs.

Richard N. Cox, Asst. U.S. Atty., Springfield, Ill., Terri E. Schapiro, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

MILLS, District Judge:

A question of taxes.

The Trustees of the Scully Trusts filed this action against the United States, seeking refunds of alleged overpayments of tax resulting from a re-valuation of property sold by the trusts. The parties filed cross motions for summary judgment pursuant to Fed.R.Civ.P. 56.

On May 23, 1985, United States Magistrate Charles H. Evans entered a recommendation that the Trustees' motion for summary judgment be denied, and that the Government's motion for summary judgment be granted. In accordance with Fed.R.Civ.P. 72, objections of the Trustees to the recommendation and the Government's response are now before the Court, both supported by the well prepared memoranda of the parties.

### Background [1]

The trustees and the Commissioner are in agreement as to the broad outline of the facts. The cause concerns the sale of portions of large tracts of farmland over which the Scully family has exercised ownership and careful stewardship for several generations. In 1959, Thomas A. Scully created two trusts, one for the benefit of his lineal descendants *per stirpes* through his son, Peter, and one for the benefit of his lineal descendants *per stirpes* through his son, Michael. Mr. Scully endowed each trust with tracts of farmland and named his two sons co-trustees of both trusts. The trust agreement essentially grants a life estate to all of Mr. Scully's grandchildren with the corpus to be distributed *per stirpes* ten years after the death of the last person to die among those listed in the trust agreement. The Court will refer to these trusts as the "family trusts." Upon Mr. Scully's death (approximately two years after the creation of the family trusts), Mr. Scully created by his will two

more trusts, a "marital trust" and a "residuary trust." His will named his two sons trustees of these two trusts as well.

The disposition of the marital trust is directly at issue here. Mr. Scully's will provided that his wife, Violet (Mrs. Scully), should receive the income from the marital trust's assets for life and should have the power to appoint the disposition of the assets upon her death. In default of appointment by Mrs. Scully, the assets were to be added to the residuary trust and, in accordance with that trust's provision, distributed eventually to Mr. Scully's lineal descendants *per stirpes*.

Mrs. Scully died in 1976. She exercised her power of appointment by directing the trustees of the marital trust to donate a relatively small amount of land to the Lincoln County Park and Trails Foundation and to divide the remainder of the trust corpus equally between her sons' families, then evenly among her grandchildren in each of the two families. She further directed that her sons, Peter and Michael, serve as co-trustees for each of the resulting nine trusts. The Court will refer to these trusts as the "individual trusts."

This litigation concerns two sets of trusts: the two "family trusts" (one trust for each of the two sons' children as a group) arising during Mr. Scully's lifetime and one set of nine individual trusts (one trust for each of the nine grandchildren) arising at the time of Mrs. Scully's death.

In her will, Mrs. Scully directed the executors of her estate, her sons Peter and Michael, to pay or arrange for payment of administrative expenses, cash bequests, and estate tax liabilities. Mrs. Scully's estate, however, lacked liquid assets sufficient to satisfy the bequests and charges. In order to raise the necessary funds, the executors, acting in their capacity as trustees of the individual trusts, sold land held by the individual trusts to the two family trusts for which they also acted as trustees. The individual trusts sold and the family trusts purchased the farm real es-

---

1. The factual outline of this case is not disputed and is taken essentially verbatim from the recommendation of Magistrate Evans.

tate for the value shown in Mrs. Scully's federal estate tax return. A subsequent review and settlement of the estate taxes resulted in an increase in the valuation of the farmland.

The Trustees claim that the increase in the valuation demonstrates that the individual trusts actually sold the land to the family trusts at a loss. They seek to apply the alleged loss against ordinary income and to recover resulting tax refunds. The Internal Revenue Service has disallowed the claim with respect to all nine of the individual trusts. Having adequately exhausted their rights to administrative redress, the Trustees seek this Court's review of their claim for a refund.

This Court is asked to determine whether the trusts involved in this dispute have a common grantor. If the family and individual trusts are found to have separate grantors, the Court must further determine whether the farmland sold was real property used in a trade or business such that a loss on the sale may be deducted against income. I.R.C. § 165(a).

In pertinent part, section 267 of the Internal Revenue Code provides that "no deduction shall be allowed ... [i]n respect of losses from sales or exchanges of property ... between ... [a] fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts ..." I.R.C. § 267(a)(1), (b)(5). The litigants agree that Mr. Scully was the grantor of the family trusts; they ask this Court to decide whether, in light of the undisputed facts of this case, Mrs. Scully's exercise of her power of appointment establishes her as the grantor of the individual trusts.

In deciding whether Mr. Scully was the grantor of the individual trusts, the Magistrate, citing three United States Supreme Court cases, initially determined that the

Illinois law of estates and trusts controlled. *See Helvering v. Stuart,* 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154 (1942); *Morgan v. Commissioner,* 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 1035 (1940); *Blair v. Commissioner,* 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937). The gravamen of the Trustees' objection is that the Magistrate erred in resolving under Illinois law the question of whether, for the purposes of section 267 of the Internal Revenue Code, Mr. Scully was the "grantor" of the trusts created by Mrs. Scully's exercise of her general power of appointment. Rather, the Trustees contend, the construction of the term "grantor" should have been determined under a uniform federal law concept of the term, so that the taxability of the transaction in issue is not dependent upon the vagaries of local property law.[2]

### The Result Under Illinois Law

As ably pointed out by the Magistrate, Illinois has generally recognized that upon the exercise of a power of appointment, the appointment of assets relates back to the time of the power's creation "as if [the appointment] had been originally contained in the donor's will." Restatement (First) of Property, p. 1811 (1940). "Property passing pursuant to the exercise of the power passes under the instrument creating the power, just as though the appointment were read into the original instrument." *In re Estate of Breault,* 29 Ill.2d 165, 174, 193 N.E.2d 824 (1963). In light of these precedents, Mrs. Scully's exercise of her general testamentary power of appointment would relate back to Mr. Scully's creation of the Marital Trust, and Mr. Scully would be denominated the grantor of the individual trusts.

There is, however, one exception,[3] relevant here, to the general rule that the

---

**2.** Plaintiffs also argue, of course, that federal law would hold that the donee of a general power of appointment is the "grantor" of a trust created pursuant to an appointment. This conflicts with the Magistrate's interpretation of Illinois law, whereby the *donor* of the power is considered the grantor of whatever is later appointed by the donee (whether the donee appoints in trust or otherwise).

**3.** Plaintiffs cite two cases which they believe adopt exceptions to the "relation back" rule that are relevant here. However, this Court is not compelled by dicta in *Gilman v. Bell,* 99 Ill. 144 (1881), to the effect that an exercise of a presently exercisable power would leave the assets subject to the power liable for the power holder's debts to prevent the power holder from defrauding his creditors. This action concerns

exercise of a power of appointment relates back to the donor of the power: "[P]roperty subject to a general power of appointment may pass as a part of the estate of the donee of the power if the donee shows an intention to take such property 'out of the instrument creating the power,' and 'to make it his own for all purposes' ..." *Breault* at 174, 193 N.E.2d 824, *quoting* Cary and Schuyler, Illinois Law of Future Interests, Sec. 364, p. 491 (1941). The question for this Court is, therefore, whether Mrs. Scully's will evinces an intention to make the property her own for all purposes.

In determining whether the testator treated appointive and personal assets as his own for all purposes, the *Breault* court emphasized the treatment of the assets for the purpose of satisfying charges against the testator's estate. *Breault* at 177. The testator in *Breault* clearly intended to commingle the assets he held personally and the assets over which he held appointive power, but his will did not treat the two sets of assets in the same manner. This difference in treatment, the *Breault* court found, prevented the appointive assets from becoming a part of the testator's personal estate and left the grantor of the appointive power as the donor of the assets appointed. The same test may be applied under the present circumstances.

A review of Mrs. Scully's will reveals that she clearly intended for her personal assets and the Marital Trust assets to be commingled at some point in time. Article VII of her will expressly provides that "the property I own at my death ... be added to the Marital Trust Estate." The language adopted, however, implies an intention to pour her personal assets into the Marital Trust, not an intention to make the Marital Trust assets her own. Determining into which vehicle the assets were poured is, as Plaintiffs point out, the sort of ritualistic formalism that the law would ordinarily do best to abjure. But in this context, reference to form aids in the devination of intent. The manner in which Mrs. Scully treated the assets subject to her control evince an intent to keep the Marital Trust a viable entity and, no doubt, a shield against unforeseen creditors with claims on whatever they could characterize as her estate.

This Court need not, however, rest its decision solely on the manner in which Mrs. Scully combined the assets she controlled. The Court looks also to the substantive differences resulting from the manner in which the assets were treated by the will before the combining or commingling was executed. Here, Mrs. Scully's will treated her personal assets and the Marital Trust assets differently for the purpose of satisfying charges against her estate.

The will does provide for the satisfaction of all "the expenses of administration ... all cash gifts ... and all estate and inheritance taxes ..." out of the assets in the Individual Trusts to be derived from the Marital Trust, but only in "such amounts as the trustee shall be liable or *may agree to pay.*" Article VI, paragraph (c) (emphasis added). Her personal assets, in contrast, are charged with the payment or arrangement for payment of these charges "prior to the distribution of [Mrs. Scully's personal] estate." Article VIII(c). The assets funding the Individual Trusts, the Marital Trust assets, are only secondarily responsible for the enumerated expenses should the trustees of the two trusts so agree. Mrs. Scully's will places primary responsibility for payment of those charges

---

a testimentary power which by its nature may be exercised without necessarily bringing the underlying assets into the donee's estate. The issue here is not exercise alone but how the manner of exercise affects the transfer of the underlying assets.

*Bradford v. Andrew,* 308 Ill. 458, 139 N.E. 922 (1923), does concern the exercise of a testimentary power, but only in the context in which the recipient of the underlying assets has predeceased the donee exercising the power. The

*Bradford* court specifically rejected the contention that the mere exercise of a power of appointment brings the assets subject to the power into the estate of the person who holds the power. Instead, the court construed the residuary clause in the power holder's will to commingle the assets subject to the power with her personal assets. The will in question, unlike the will before this Court, did not distinguish between the assets subject to the appointive power and those assets held personally.

incurred or directed as a result of her death on her personal assets.

Article VII's instruction to add the testatrix's personal estate to the Marital Trust estate could not be carried out until Article VIII's instructions to pay or arrange for payment of the enumerated expenses had been accomplished. Like the testator in *Breault*, Mrs. Scully appears to have directed the payment of expenses (or the arrangement for payment) before any blending or commingling of the assets in her personal estate and the assets of the Marital Trust estate. *See Breault* at 177, 193 N.E.2d 824.

■ This Court cannot find that the testatrix "treated the two estate as one for all purposes," *Breault* at 176, 193 N.E.2d 824, and consequently must find that Mrs. Scully did not appoint the assets funding the Marital Trust estate to her own estate. The Marital Trust assets were appointed directly to the Individual Trusts. Thus, under Illinois law, Mr. Scully, the grantor of the Marital Trust, would also be the grantor of the Individual Trust; and any deduction for losses incurred on the sale of assets between the two trusts would be barred by I.R.C. § 267.

The Trustees, however, object to the Magistrate's application of Illinois law. They contend that federal law must determine whether Mr. Scully was the grantor of both trusts for the purposes of § 267.

### Illinois or Federal Law

■ As the Trustees correctly point out, Congress' intent in passing the Internal Revenue Code was to provide for the uniform application of a nationwide scheme of taxation. *See Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932). Pursuant to this intention, the Court in *Burnet* held that federal tax legislation, "in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation." *Id.* Further, "state law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Id.*

At the same time, however, Congress in drafting the tax code clearly did not intend to redefine whole areas of legal relationships created by state property law, but instead sought to impose a generally uniform system of taxation upon the existing legal structure. *Ernest & Mary Hayward Weir Foundation v. United States*, 362 F.Supp. 928, 932 (S.D.N.Y.1973), *aff'd*, 508 F.2d 894 (2d Cir.1974); *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 425–26, 84 L.Ed. 1035 (1940). The objectives to be sought in administering the federal tax code within this framework of state law, therefore, should be to minimize tax differences among the states while not encroaching on the customary role of state law in the federal system. *See* Note, *The Role of State Law in Federal Tax Determinations*, 72 Harv.L.Rev. 1350, 1351 (1959).

■ State law is not, however, used for tax purposes in the same manner that it is applied by federal courts exercising diversity jurisdiction, under which state law furnishes the substantive rule of decision. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 823–24, 82 L.Ed. 1188 (1938). In tax cases, the substantive rule is federal, with state law establishing some of the facts to which the Court applies federal law in order to reach its conclusions, and whether a particular fact should be established by means of state law is a matter of legislative intent. *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 425–26, 84 L.Ed. 1035 (1940); *Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932). As explained in *Morgan:*

> State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.

309 U.S. at 80–81, 60 S.Ct. at 426. In this case, section 267 of the Code intends to disallow deductions resulting from losses from the transfer of property between trusts that have the same grantor. Thus, this Court must determine whether Congress intended the term "grantor" in section 267 of the Code to be determined by reference to state law, or whether a more uniform federal tax law is determinative. Where, as here, there is no explicit reference to state law in the statute, the intent of Congress must be ascertained in accordance with principles established by a number of Supreme Court cases in this area.

### Supreme Court Guidelines

■ The first general principle enunciated by the Supreme Court and the principle most often stated by recent decisions is that state law initially determines the specific consequences of the legal relationship in issue; those consequences are then applied to standards established by federal tax law to determine if and when they should be taxed. *Burnet*, 287 U.S. at 110, 53 S.Ct. at 77; *Lyeth v. Hoey*, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938); *Helvering v. Stuart*, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154 (1942). *See also, Independence Bank Waukesha (N.A.) v. United States*, 761 F.2d 442, 444 (7th Cir.1985) ("[a] determination of the legal rights and interests created by an instrument is a question of state law."); *Brantingham v. United States*, 631 F.2d 542, 545 (7th Cir.1980) (same); *Little v. United States*, 704 F.2d 1100 (9th Cir.1983) ("state law controls in determining the nature of the legal interest which the taxpayer has in the property sought to be reached by the federal statute."). Thus, once it is determined that the taxpayer possesses a certain legal relationship to property recognizable under state law, the federal tax consequences of such rights are solely a matter of federal law. As a consequence of this principle, for example, liens provided by federal statute may not be defeated by state exemption statutes. *United States v. Bess*, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958).

This apparently broad principle, however, has not been interpreted to mean that every peculiarity and special incidence of local law controls in applying federal tax law. For instance, in *Lyeth v. Hoey*, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938), the Supreme Court held that pursuant to section 22(b)(3) of the Revenue Act of 1932 —permitting an exemption for the "value of property acquired by bequests, devise or inheritance"—the plaintiff's *status* as an heir should be determined by state law. But once it was established that plaintiff was an heir, "the question whether what the heir had thus received had been 'acquired by inheritance' within the meaning of the federal statute necessarily is a federal question. It is not determined by local characterization." *Id.* In so holding, the Court explained that:

> [i]n dealing with the meaning and application of an act of Congress enacted in the exercise of its plenary power under the Constitution to tax income and to grant exemptions from that tax, it is the will of Congress that controls, and the expression of its will, in the absence of language evidencing a different purpose, *should be interpreted "so as to give a uniform application to a nationwide scheme of taxation."*

*Id.* at 194, 59 S.Ct. at 158 (*quoting Burnet v. Harmel, supra*, 287 U.S. at 110, 53 S.Ct. at 77.)

Applying this standard to the facts of *Lyeth*, the Court held that in framing the statute in words such as "inheritance," "devise" and "bequest," Congress "used comprehensive terms embracing all acquisitions in the devolution of a decedent's estate." *Id.* at 194, 59 S.Ct. at 159. This persuaded the Court to hold that although a person's status as an heir is determined by state law, Congress intended a uniform federal meaning to be given to the phrase "acquired by inheritance."

Another case emphasizing Congress' intent to provide for a generally uniform application of tax law is *Rogers' Estate v. Helvering*, 320 U.S. 410, 64 S.Ct. 172, 88 L.Ed. 134 (1943). In that case, the Court

held that although state law determines the *attributes* of a power of appointment, federal law determines whether the power is "general" or "special" regardless of the state terminology. *Cf. Morgan, supra,* 309 U.S. 78, 60 S.Ct. 424. Again the problem of attempting to insure a uniform tax structure given a preexisting structure of state property law was addressed:

> Whether for purposes of local property law testamentary dominion over property is deemed a "special" or a "general" power of appointment, ... whether local *tax legislation* deems the appointed interest to derive from the will of the donor or that of the donee of the power, ... whether for some purposes in matters of *local property law title is sometimes traced to the donee of a power and for other purposes to the donor ... are matters of complete indifference to the federal fisc.*
>
> Whether by a testamentary exercise of a general power of appointment property passed under § 302(f) is a question of federal law, once state law has made clear, as it has here, that the appointment had legal validity and brought into being new interests in property.... Were it not so, federal tax legislation would be the victim of conflicting state decisions on matters relating to local concerns and quite unrelated to the single uniform purpose of federal taxation.... In taxing "property passing under a general power of appointment exercised ... by will", Congress did not deal with recondite niceties of property law nor incorporate a crazyquilt of local formalisms or historical survivals."

*Id.* 320 U.S. at 413–14, 64 S.Ct. at 174. (Emphasis added and citations omitted.)

Further explanation was provided by the Court in *Helvering v. Stuart,* 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154 (1942). There, the Court was asked to decide whether, under §§ 166 and 167 of the Code, income from a trust is includable in the gross estate of the grantor of the trust. In holding that state law should determine whether the taxable event—the receipt or distribution of trust funds by or to the grantor—had occurred, the Court stated:

> When Congress fixes a tax on the possibility of the revesting of property or the distribution of income, the "necessary implication," we think, is that the possibility is to be determined by the state law. Grantees under deeds, wills and trusts, alike, take according to the rule of the state law. The power to transfer or distribute assets of a trust is essentially a matter of local law. [Citations omitted.] Congress has selected an event, that is the receipt or distributions of trust funds by or to a grantor, normally brought about by local law, and has directed a tax to be levied if that event may occur. Whether that event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law. Once rights are obtained by local law, whatever they may be called, these rights are subject to the federal definition of taxability.

*Id.* at 161–162, 63 S.Ct. at 144–45. In addition, the Court explained that in both *Morgan* and *Lyeth,* the Court was determining what interests or rights should be taxed, not what interests or rights had been created, and therefore applied the federal rule. Because the tax in *Stuart* was fixed upon an event brought about by state law, whether that event occurred was held to be governed by state law.

### *Considerations in Choosing State or Federal Law*

In view of these and other Supreme Court precedents, courts and commentators have taken a variety of approaches in determining whether state or federal law should govern the meaning of a particular term in the tax code. Recent decisions follow the general test: that state law initially determines the specific consequences of the legal relationship in issue, with federal law then determining if they should be taxed. *See e.g., Brantingham, supra,* 631 F.2d at 545. This general rule, however, must be read in conjunction with cases such as *Morgan* and *Lyeth,* which emphasize the applicability of federal law absent a "necessary implication" to the contrary.

The approach taken by the district court in *Weir, supra,* 362 F.Supp. 928, attempts to take into account these competing concerns by focusing on the nature of the term used by Congress in drafting the tax provision in issue. In *Weir,* the Court noted that the Supreme Court refused to be bound by state law when considering the words "sale," *Burnet;* "inheritance," *Lyeth;* "general power of appointment," *Rogers' Estate,* but did rely on state law to determine "heir," *Lyeth;* the specific attributes of a power, *Rogers' Estate, Morgan;* the extent to which a trust can be invaded, *Miller;* and the proper amount "distributable" from a trust, *Freuler. Id.,* 362 F.Supp. at 935.

Focusing on the nature of these words, the Court held, *inter alia,* that when terms have a technical significance in state statutory or common law, they should be interpreted by reference to this law, since the use of such terms is persuasive evidence that Congress intended them to be interpreted in their traditional context. As stated by the *Weir* court:

> The guiding yardstick I extract from these cases is that in respect of general words of common usage, words which Congress would necessarily use to express a broad principle rather than a specific transaction, federal law should control without reference to nuances of local color. On the other hand, recognizing that Congress did not intend the tax law to establish a superseding code of primary relationships, the use of words of art which by their nature require reference to specific definitional or applicative elaboration in order to take on meaning mandates reference to state law.

As the Court also noted, however, this distinction is not always sharply apparent. For instance, in *Burnet* the word "sale" could be seen either as a general word of common usage or a specific term of art.

■ Although the *Weir* approach does take into account the competing concerns articulated by the Supreme Court, it is not always helpful in a case where the term used can be viewed as either a general word of common usage or a specific term of art. This problem exists with respect to many terms, and it appears that the degree of legal significance of a term is too elusive a standard for choosing the usage intended. For instance, words such as "charitable," "future interest" and "terminable interest" have both technical legal and popularly understood meanings, and each has been interpreted by federal standards despite its significance in the common law. *See* Note, *supra,* 72 Harv.L.Rev. at 1357. Thus, the nature of the term "grantor" should not alone control the issue of whether state or federal law will define its meaning under the tax code.

■ As a factor in determining whether state or federal law should apply, the label used by the tax code can point to state law where the label is a reliable indicator of specific legal and economic consequences under state law. For instance, in order to determine the attributes of a "corporation" or a "partnership" for federal tax purposes, it is necessary to go behind the labels and look to state law to determine the underlying legal relationships of the parties. *See Morrissey v. Commissioner,* 296 U.S. 344, 358, 56 S.Ct. 289, 295–96, 80 L.Ed. 263 (1935). By contrast, state concepts of title are often disregarded for tax purposes as "title" is a concept based on commercial necessities and is not indicative of many legal relations in respect to property. *See* Note, *supra,* 72 Harv.L.Rev. at 1354 (and cases cited therein).

■ In the present case, the term "grantor" is most readily viewed as an indicator of specific legal and economic consequences under state law. With respect to powers of appointment, these specific consequences include: the donor (or grantor) of the property does not vest title to the property in the donee; the objects of an appointment take from the donor, not the donee; the property passing pursuant to the exercise of the power passes under the instrument creating the power, just as though the appointment were read into the original instrument; and, the property subject to the power passes as part of the estate of the donor of the power. *Breault, supra,* 29 Ill.2d at 174, 193 N.E.2d 824.

Among the various consequences of these rules is that a creditor of the donee cannot reach the property subject to the power since the donee is not the "grantor" of the property. Thus, the term "grantor" has specific state law consequences that support an inference that Congress intended state law to control the issue.

In addition to the nature of the term "grantor" itself, other factors counsel in favor of applying state law. One such factor is the advantage of predictability in tax planning. Lawyers are accustomed to operating within a preexisting framework of state property and probate law, and this law is generally more settled than the comparatively recent and shifting tax legislation. Application of state law would thus preserve the choices currently available to estate planners under state law.

A related concern is the infeasibility of developing an entire body of federal trust law that would be required to apply a federal tax law. Had Congress intended to impose such a burden on the federal judiciary, it seems likely that it would have done so explicitly. Moreover, judicial formulation of a comprehensive set of rules would take many years during which tax liabilities in this area would be unpredictable. In the absence of a clear federal policy to be effectuated by imposing a uniform definition to the term "grantor", application of state law would avoid the problem of requiring the federal courts to redefine and reinstitute vast areas of property law.[4]

A final factor evidencing a legislative intent to look to state law under the circumstances of this case is a general rule of statutory construction: that in interpreting a provision of the tax code, federal law should govern if recognition of state law would substantially impair the efficacy of the general rule, thereby reducing the revenue normally produced. *See* Note, *supra,* 72 Harv.L.Rev. at 1357 (and cases cited therein). The stated purpose of section 267 is to disallow claimed losses when there has been only a shuffling of the asset between two entities with nearly identical economic interests. *See Hassen v. Commissioner,* 599 F.2d 305 (9th Cir.1979). Thus, to claim a tax loss, the Code requires an *"economically* genuine realization of loss." *McWilliams v. Commissioner,* 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947).

In this case, rather than impairing the efficacy of the general rule disallowing deductions where two trusts have a common grantor, application of state law enhances its efficacy by not allowing the device of a general power of appointment to provide a substantial tax loophole, where in reality there has been no genuine economic loss. It would thus be consistent with Congress' intent to apply state law where, as here, doing so does not undermine the purposes of the general rule in issue and does not reduce the revenue normally produced by the rule.

### Conclusion

In light of the competing concerns articulated by the Supreme Court and the policies implicated by the varying approaches, this Court believes that the preexisting legal framework of state trust law should initially determine the question of whether Mr. Scully is the "grantor" of the trusts in issue. When Congress provided for the nondeductibility of losses from transactions between two trusts with a common grantor, the "necessary implication" is that the definition of a "common grantor" is to be determined by state law. The power to transfer or distribute property through the means of a general power of appointment

---

4. It is also not clear that a uniform federal law would define the term "grantor" differently than Illinois. Plaintiffs argue that Congress would follow *Scott on Trusts,* which states that:

> Since the donee of the power may appoint to anyone he chooses, he may appoint in trust as well as directly. If he appoints in trust, he, and not the donor of the power, is the settlor.

*Scott on Trusts* (3d ed.), § 17.2.

As pointed out by the Magistrate, however, the Restatement approach adopted by Illinois states that the appointment of assets relates back to the time of the power's creation "as if [the appointment] had been originally contained in the donor's will." Restatement (First) of Property, p. 1811 (1940).

is essentially a matter of state law, and the attributes of such powers—including the fact that the donor of a power is considered to be the grantor of whatever is appointed by the donee (in trust or otherwise)—are created by state law.

Under these circumstances, it is more likely that Congress intended to apply the language of section 267 of the tax code to the already existing legal structure rather than to redefine whole areas of legal relationships originally created by state property law. Therefore, the Magistrate correctly applied Illinois law, rather than federal law, to the facts of this case.

*Ergo*, the recommendation, and able reasons therefor, of Magistrate Evans is adopted.

Plaintiff Trustees' motion for summary judgment is DENIED.

Defendant Government's motion for summary judgment is ALLOWED.