840 F.2d 478
 61 A.F.T.R.2d 88-706, 88-1 USTC P 9191
 Michael J. SCULLY and Peter D. Scully, as Trustees of the
Paula Alyce Scully Trust, John Frederick Scully Trust, David
Lewis Scully Trust, Merida Jane Scully Trust, Richard Peter
Scully Trust, Nadine Gay Scully Trust, Kirsten Maya Scully
Trust, Thomas Peter Scully Trust and Michael James Scully
Trust, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 86-1657 & 87-1100.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 28, 1987.
Decided Feb. 18, 1988.
Rehearing Denied March 23, 1988.
 
 Loren E. Juhl, Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.
 Robert S. Pomerance, Asst. Atty. Gen., Appellate Sec. Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.
 Before EASTERBROOK, RIPPLE and KANNE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Michael J. Scully and Peter D. Scully, as trustees of nine trusts established for members of the Scully family, brought this action against the United States seeking a refund of $274,583 in income taxes paid by the trusts. The trustees argued that the trusts were entitled to the refund because the trusts had sold 980 acres of real estate at a loss of more than $500 per acre. The district court granted the government's motion for summary judgment on the ground that section 267(b)(5) of the Internal Revenue Code of 1954 (Code) disallowed the loss. The trustees appealed. During the pendency of that appeal, the government changed its position and concluded that section 267(b)(5) did not disallow the loss, but that section 267(b)(6) did so. Based on the government's change of position, this court remanded the case to the district court so that the trustees could file a motion seeking relief from the district court judgment under Rule 60(b) of the Federal Rules of Civil Procedure.[1] On remand, the district court denied the trustees' motion and reaffirmed its earlier judgment. It adhered to its earlier view that section 267(b)(5) was the applicable section and that this section disallowed the trusts' claimed loss. The trustees, in accordance with the earlier ruling of this court, then filed an appeal from the district court's denial of the Rule 60(b) motion that was consolidated with their earlier appeal.
 
 
 2
 We conclude that the loss was properly disallowed. However, we affirm the judgment of the district court on the ground that Code section 165 does not permit deduction of the loss, and not on the rationale relied upon by the district court.
 
 
 3
 * Facts
 
 A. The Scully Tradition
 
 4
 In the 1850's, William Scully, a native of Ireland, purchased 46,000 acres of land in central Illinois. Rather than farm this land himself, Mr. Scully chose to lease the land in a fashion similar to the one his family had used in Ireland for many years. Under this system, the typical lease term was only one year, but the tenants were assured that their lease would be renewed if they paid their rent promptly in cash and if they properly maintained their property. The tenants were required and encouraged to construct and maintain buildings, fences and other improvements. If the tenant wished to move or retire, he was entitled to sell his improvements to a succeeding tenant, if acceptable to Mr. Scully, as if those improvements were personal property.
 
 
 5
 Most of the 46,000 acres have remained in the Scully family ever since, and the practices instituted by William Scully are still respected. The family itself refers to the practice as the "Scully Tradition." The land is managed today by Michael and Peter Scully, the grandchildren of William, with the help of two agents, from offices in Lincoln and Dwight, Illinois. They arrange the leases, collect the rents, pay the taxes, maintain the drainage system, and ensure that the tenants abide by the leases. Many of the tenants belong to families that have leased the same land from the Scullys for three or four generations. The tenants have erected valuable improvements on the land, aggregating $10 million or more, and they rely on the Scully Tradition to safeguard their investments. Michael and Peter Scully agree that it is important that the property stay in the family.
 
 B. The Transaction
 
 6
 In 1959 title to the land was in Thomas Scully, the son of William and the father of Michael and Peter. In that year, Thomas created two trusts (the Buying Trusts), one for the benefit of Michael's children, the other for the benefit of Peter's children. Thomas placed some of his land into those trusts. The terms of the Buying Trusts provided that the trust estate should be divided into shares of equal value for each of Michael's and Peter's children, with Michael and Peter serving as co-trustees. If Michael or Peter should have additional children, the trust estate was to be redivided so that each child would have an equal share. The Buying Trusts' dispositive provisions provided that two-thirds of the annual income from the trusts was to be paid to the children after they reached the age of 21, and one-third was to be added to corpus. The Buying Trusts were to terminate ten years after the death of the last to die of the children of Michael and Peter living in 1959. When any of the children died during the term of the Buying Trusts, that child's descendants would succeed to that interest per stirpes.
 
 
 7
 Thomas died in 1961. By his will, one-half of his adjusted gross estate was placed in a marital trust for the benefit of his wife Violet. She was given a general power of appointment over the assets in the marital trust "as she shall direct in her Will." If she did not exercise the power of appointment, the property in the marital trust was to be added to, and disposed of, as part of Thomas' residuary estate.
 
 
 8
 Violet died on August 9, 1976. At that time, more than 7,000 acres of the Scully land was held in the marital trust. In her will, she exercised the power of appointment and directed that most of this land be divided into equal trusts for the benefit of each of Michael's and Peter's children (the Selling Trusts).[2] Michael and Peter were named co-trustees of the Selling Trusts. All relevant provisions of the trusts were the same as for the Buying Trusts, with two exceptions. First, all income of the Selling Trusts, instead of two-thirds of the income, was to be distributed to the children once they reached the age of 21. Second, the Selling Trusts were to terminate ten years after the death of the last to die of Michael's and Peter's children who were living in 1961. Because three children had been born between 1959 and 1961, the termination date was therefore potentially later.
 
 
 9
 Under the terms of Violet's will, the Selling Trusts were requested to pay all taxes, expenses of administration, and other costs associated with the settlement of her estate.[3] 3] The trusts lacked the cash to make those payments. The Buying Trusts, on the other hand, had ample assets with which to meet the obligations. Therefore, Michael and Peter, as trustees of the Selling Trusts, sold 980 acres of land in the Selling Trusts to the Buying Trusts. The price was $1,550 per acre. This price, arrived at by means of an appraisal commissioned by Peter and Michael, had been used to fix the value of Violet's property for purposes of her estate tax return. In order to preserve the Scully Tradition, no part of the 980 acres was ever offered for sale to anyone besides the Buying Trusts.
 
 
 10
 For 1977, the year of the sale, the Selling Trusts' tax returns reported no gain or loss on the transfer of the 980 acres.[4] In 1980, however, the Internal Revenue Service (IRS) audited Violet's estate tax return and had the property appraised. The government then concluded that Violet's estate had been undervalued. Michael and Peter compromised the dispute and agreed to revalue the land at $2,075 an acre. One month later, Michael and Peter filed administrative claims for refunds for the Selling Trusts' 1977 tax returns. Michael and Peter claimed that the trusts' basis in the 980 acres was $2,075 per acre (not $1,550 as previously reported), and that therefore the trusts sustained a loss of $525 per acre. The IRS denied the refund claim. This litigation followed.
 
 C. Earlier Proceedings
 
 11
 In the district court, the trustees and the government filed cross-motions for summary judgment. The government argued that the Selling Trusts' claimed loss was disallowed by section 267(a)(1) and section 267(b)(5) of the Code.[5] Section 267(a)(1) provides that no deduction is permitted for any loss resulting from the sale or exchange of property between certain related parties. Section 267(b)(5) provides that the fiduciaries of two different trusts are related parties within the meaning of section 267(a)(1) if the two trusts have a common grantor. The government contended that Thomas Scully was the grantor of both sets of trusts because Illinois law determined the "grantor" of a trust for purposes of section 267, and Illinois law treats the donor of a general power of appointment as the grantor of a trust created by the exercise of that power. The trustees argued that federal law defined "grantor," and that, under federal law, the donee of a general power of appointment was the grantor of any trust that the donee created by exercise of the power. In the alternative, the trustees argued that, even under Illinois law, the donee of a general power of appointment should be treated as the grantor of any trusts he creates.
 
 
 12
 As a second argument, the government argued that the sale lacked the bona fide, arm's length character needed to satisfy section 165 of the Code, which grants a deduction for qualifying losses sustained by a taxpayer.[6] The government fully briefed this argument for the district court. The trustees responded to this argument, contending that the sale in this instance was made at a fair price as part of the trade or business of the Selling Trusts, and that there was no intention or motive of tax avoidance in the transaction.
 
 
 13
 The district court ruled for the government; it concluded that Illinois law, not federal law,[7] controlled with respect to the definition of a grantor of a trust, and that under Illinois law Thomas Scully was the grantor of the Selling Trusts and of the Buying Trusts. Scully v. United States, 629 F.Supp. 1534 (C.D.Ill.1986). The court reasoned that Illinois applies the doctrine of "relation back," under which " '[p]roperty passing pursuant to the exercise of the power passes under the instrument creating the power, just as though the appointment were read into the original instrument.' " Id. at 1537 (quoting In re Estate of Breault, 29 Ill.2d 165, 193 N.E.2d 824 (1963)). Under this doctrine, the court noted, Thomas Scully would be treated as the grantor of any trust created by his widow's exercise of a power of appointment.[8]
 
 
 14
 The Scullys appealed that decision to this court. During the pendency of the appeal, the government changed its position; it submitted to this court that the district court had erroneously decided that state law should define the term "grantor." The government therefore moved this court to remand the case so that the district court could determine whether the losses should have been disallowed on other grounds. Over the opposition of the trustees, this court granted the government's motion and remanded the case for further consideration by the district court.[9]
 
 
 15
 On remand, the trustees moved the district court to reopen the judgment under Rule 60(b). The government opposed the motion and urged the court to adhere to its prior judgment, albeit on different grounds. First, the government argued that the Selling Trusts' loss should be disallowed based on Code section 267(b)(6). That section disallows losses incurred in a transaction between "[a] fiduciary of a trust and a beneficiary of such trust." 26 U.S.C. Sec. 267(b)(6). The government conceded that the transaction here at issue was not expressly within the terms of that section, but argued that the transaction was "indirectly" within the statute. In the alternative, the government renewed its argument that the transaction was not a recognizable loss under section 165.
 
 
 16
 The trustees responded that the government's new argument under section 267(b)(6) was unavailing because the government had waived the argument by failing to present it to the district court earlier. On the merits, the trustees contended that section 267(b)(6) was inapplicable to their situation because the sale between the two sets of trusts was not a sale between a fiduciary of a trust and a beneficiary of the same trust. As to the government's section 165 argument, the trustees again contended that the Selling Trusts were engaged in a valid trade or business, and that the transaction was conducted at arm's length at a fair price.
 
 
 17
 The district court denied the trustees' motion, but not for the reasons suggested by the government. Scully v. United States, No. 84-3053, order (C.D.Ill. Dec. 19, 1986); R. 50. In the court's view, neither party had presented sufficient authority to warrant a departure from the court's original decision. Therefore, the court reaffirmed its earlier decision that section 267(b)(5) prevented the Selling Trusts from recognizing any loss resulting from the transaction. In regard to the government's claim under section 267(b)(6), the court said that the government had waived this argument by failing to present it during the initial proceedings in the district court. The court added that this argument was without merit, even if it were timely. Finally, because of the court's decision that section 267(b)(5) disallowed plaintiffs' losses, the court did not address the issue of whether section 165 would also disallow the losses.
 
 II
 Discussion
 
 18
 This case comes to us in a rather unique posture. The government has abandoned its effort to disallow the deduction on the ground relied upon by the district court--section 267(b)(5). It now argues that the deduction can be disallowed, if at all, only on the authority of either section 267(b)(6) or section 165. Because we believe that the judgment of the district court must be affirmed on the latter of these two grounds, we shall not address the merits of the now-abandoned argument based on section 267(b)(5). See United States v. New York Telephone Co., 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376 (1977).
 
 A. Applicability of Sec. 267(b)(6)
 
 19
 In determining whether section 267(b)(6) governs this transaction, our focus must be a narrow one. The government admits, as it must, that the sale between the Selling Trusts and the Buying Trusts was not a sale "directly" between the "fiduciary of a trust and a beneficiary of such a trust." Therefore, we must focus on whether the sale was "indirectly" between the "fiduciary of a trust and a beneficiary of such a trust."
 
 
 20
 In addressing this question, it is hardly necessary for us to define "indirectly" as it might apply to all transactions. In McWilliams v. Commissioner, 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1570 (1947), the Supreme Court cautioned, rather explicitly, against giving the term too narrow a reading: "Congress ... could not have intended to include within the scope of Sec. 24(b) [the predecessor to section 267] only transfers made directly or through a dummy, or to exclude transfers of securities effected through the medium of the Stock Exchange, unless it wanted to leave a loop-hole almost as large as the one it had set out to close." Id. at 700-01, 67 S.Ct. at 1481; accord Miller v. Commissioner, 510 F.2d 230, 233 (9th Cir.1975).[10] At the same time, we must be careful that our interpretation is not one which "carries us beyond interpretation into the realm of amendment. Into that realm we are forbidden to go." Miller, 510 F.2d at 234.
 
 
 21
 Whatever may be the outer limits of the term "indirectly" in other contexts, we believe that, when distinctions between legal and equitable ownership are central to the inquiry, the lines drawn by Congress in the wording of this section must be respected. In section 267(b), Congress delineated with great precision those transactions involving trusts that came within the ambit of the statute.[11] As the Tax Court noted in Widener v. Commissioner, 80 T.C. 304 (1983), section 267 "is a carefully drafted statute that imposes an irrebuttable presumption of a lack of bona fides on taxpayers claiming losses from certain carefully defined classes of transactions.... [W]here Congress intended to disallow losses in transactions where a trust is a party, it did so expressly." Id. at 309-10 n. 5. Therefore, we believe that we cannot, consistent with our duty to effectuate the intent of Congress, disregard, for purposes of interpreting section 267, the trust entities, obviously established and maintained in good faith, that undertook this transaction. Congress carefully delineated those transactions regarding trusts, their fiduciaries, and their beneficiaries that would run afoul of section 267. This transaction was not among them.
 
 B. Applicability of Sec. 165
 
 22
 The government submits, and the trustees do not disagree, that section 267 is not the only statutory provision by which the transaction in question must be measured.[12] The sale must also pass muster under section 165. That section permits the deduction of a loss "sustained during the taxable year...." 26 U.S.C. Sec. 165(a). The Secretary has interpreted this general section as follows:
 
 
 23
 To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and section 1.165-11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.
 
 
 24
 Treas.Reg. Sec. 1.165-1(b) (1987).
 
 
 25
 The government argues that the transaction between the trusts was not bona fide because there was no genuine economic loss. The transfer left the beneficiaries, the government contends, in exactly the same economic position as before. Money simply shifted "from one pocket to another." Appellee's Br. at 33. Moreover, the government argues that this transaction is a "principal target" for disallowance under section 165 because it was a sale between family members. Id. at 29. Thus, the government submits that a "transfer like [this], which really leaves things as they were, is not an appropriate occasion for recognizing gain or loss under the Code." Id. at 33.
 
 
 26
 The trustees respond that they demonstrated to the district court that they had proceeded in good faith and in accordance with their fiduciary obligations in conducting the sales. Because the sale was made at a price arrived at by an independent appraisal, the trustees insist that the transaction was at arm's length and bona fide. They emphasize that the purpose of the transaction was to generate cash in order to pay estate taxes, and not to avoid taxation. The trustees point out that they did not know that the transaction would generate a loss until the government reappraised the property two years after the sale. Finally, the trustees claim that they were engaged in a valid trade or business (property management), and that the farmland sold was "trade or business" property.
 
 
 27
 In assessing these contentions, we begin by noting that this case is before us on the district court's grant of the government's motion for summary judgment.[13] In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that:
 
 
 28
 [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 
 
 29
 Id. 106 S.Ct. at 2552-53 (quoting Fed.R.Civ.P. 56(c)). Thus, even though the trustees are the nonmoving party, they cannot avoid summary judgment if they neglect to furnish those facts necessary to establish a bona fide loss. The law is clear that the burden of proof is upon the trustees to establish the bona fide nature of the loss. Burnet v. Houston, 283 U.S. 223, 227, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931); Fender v. United States, 577 F.2d 934, 936 (5th Cir.1978); Westvaco Corp. v. United States, 639 F.2d 700, 707, 225 Ct.Cl. 436 (1980).
 
 
 30
 To determine whether the trustees have met their burden, we must measure their evidentiary submissions against the governing legal standard. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). While cases interpreting section 165 vary enormously in their factual settings,[14] the governing principle is clear:
 
 
 31
 Losses will not be allowed which are claimed in connection with transactions which do not vary control or change the flow of economic benefits....
 
 
 32
 ....
 
 
 33
 ... [A taxpayer] will not be permitted to transfer assets from one pocket to another and take a loss thereby where he remains at the conclusion of the transfer the real owner of the property, either because of retention of title, command over the property, either directly or through the person who appears as the nominal vendee or transferee.
 
 
 34
 7 J. Mertens, Law of Federal Income Taxation Sec. 28.26 (1980). Ever since Justice Reed's opinion in Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), it has been clear that, in determining whether control has changed or the flow of economic benefits altered, the "actualities" of the situation must be assessed. Id. at 477, 60 S.Ct. at 358. While the existence of separate legal entities cannot be disregarded, this factor "is only one incident necessary to complete an actual sale...." Id. at 476, 60 S.Ct. at 357.
 
 
 35
 When the evidentiary submissions on summary judgment are measured against the standard, we do not believe that the trustees have established that they can meet their burden of establishing that the claimed loss was bona fide. The trustees have offered evidence that the purpose of the transaction was to raise cash and not to avoid taxes; similarly, they have offered evidence to suggest that the sale was made at a fair price, and that the Selling Trusts were engaged in a genuine trade or business. However, they have not shown that they can establish any actual separation in the operation of the trusts, and consequently, any genuine economic loss. We have reviewed the record and can find no significant evidence of any actual separation. As the trustees admit, the purpose of the sale was to keep all the real estate in the family. The land owned by the trusts was contiguous and used a unified drainage system. There is no evidence that any of the tenants on the land are aware of the separate ownership by the trusts. The trustees of the trusts are the same. The trustees are brothers. All of the current beneficiaries of the trusts are the children of the trustees (the grandchildren of the grantors). The remainder beneficiaries of the trusts are the descendants of the beneficiaries. Most important, as the trustees admit, the purpose of the sale was to keep all the real estate in the family and to permit the trustees to operate the land in both sets of trusts as a single, integrated economic entity. This reshuffling of assets permitted the trustees to achieve this purpose. In this respect, the present case closely resembles Northern Pac. Ry. Co. v. United States, 378 F.2d 686, 180 Ct.Cl. 388 (1967). There the court denied a loss where a parent corporation sold stock to a subsidiary in order to preserve the voting power of a parent corporation's management. The court said:
 
 
 36
 [A] sale of stock for the very end of preserving the voting power of the parent's management is clearly one transaction in which there is no lessening in domination and control, but an effort to maintain it intact, precisely as it was. Nor, as we have seen, was there any real alteration in the corporations' economic status. On the contrary, the design was to have everything remain as before. Despite the form of a loss-sale, that is the actuality and the substance.
 
 
 37
 Id. 378 F.2d at 692-93. See also Crown Cork Int'l Corp. v. Commissioner, 4 T.C. 19, 25 (1944) ("It would follow that a transfer from one to the other was no more than a shifting from one department or branch to another of the same entity, and hence that the loss is utterly lacking in finality."). We can only conclude, as did the district court, that there was, in reality, "no genuine economic loss."[15] Thus, the trustees have failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 106 S.Ct. at 2553. Therefore, the district court's grant of summary judgment to the government must be affirmed.
 
 
 38
 Finally, we do not mean to imply by our decision that there was any bad faith on the part of the Scullys. There is no evidence to suggest that the purpose of this transaction was anything other than the obtaining of cash to pay estate taxes, and, concomitantly, the preservation of a remarkable family tradition. The taxpayer's good faith does not, however, establish the legitimacy of his loss for purposes of section 165.
 
 
 39
 Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 This court's order read, in pertinent part:
 We conclude that the legal issue presented by the government should be presented to the district court for determination. Accordingly, proceedings in this appeal are STAYED and this case is REMANDED IN PART to allow consideration by that court of a motion under Rule 60, Federal Rules of Civil Procedure. If that motion is granted, this appeal will be dismissed and a new one may be taken from the new judgment. If it is denied, an appeal from the denial may be taken and consolidated with this appeal.
 
 
 [2]
 A small portion of the land, six tracts, was donated to the Logan County Park and Trails Foundation
 
 
 [3]
 The terms of Violet's will called on the trustees to pay out of the Selling Trusts' assets all administrative expenses, taxes, and cash gifts, if the trustees should be liable for their payment or if the trustees chose to do so. Thus, the trustees' decision to pay all inheritance and estate taxes out of the Selling Trusts' assets was not absolutely required by the will
 
 
 [4]
 Under Code Sec. 1014, a taxpayer's basis in property acquired from a decedent normally equals the fair market value at the date of death. Hence, the Selling Trusts initially took the position that their basis in the 980 acres was $1,550 an acre, resulting in neither a gain nor a loss on the transaction
 
 
 [5]
 Section 267(a)(1) reads:
 No deduction shall be allowed in respect of any loss from the sale or exchange of property (other than a loss in case of a distribution in corporate liquidation), directly or indirectly, between persons specified in any of the paragraphs of subsection (b).
 Section 267(b)(5) reads:
 A fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts.
 
 
 [6]
 Section 165 reads, in pertinent part:
 There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
 
 
 [7]
 The court first noted that Congress intended to provide for a "uniform application of a nationwide scheme of taxation." Scully v. United States, 629 F.Supp. 1534, 1539 (C.D.Ill.1986). It said that " 'state law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law.' " Id. (quoting Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932)). However, the court then said that "the principle most often stated by recent decisions is that state law initially determines the specific consequences of the legal relationship in issue; those consequences are then applied to standards established by federal tax law to determine if and when they should be taxed." Id. at 1540. The district court then concluded that "the term 'grantor' is most readily viewed as an indicator of specific legal and economic consequences under state law." Id. at 1542
 
 
 [8]
 The district court acknowledged that an exception exists to this rule when the donee of the general power of appointment treats the property subject to the power as his own for all purposes. Id. at 1538. However, the court noted that Violet Scully requested that the trustees pay all taxes and expenses out of the Selling Trusts' assets. This persuaded the court that she had not viewed these assets as her own. Id. Therefore, the district court determined that the exception was inapplicable, and that under Illinois law Thomas Scully should be deemed the grantor of the Selling Trusts
 
 
 [9]
 See supra note 1
 
 
 [10]
 "[W]e do not wish to be understood as suggesting by affirming the Tax Court that the only 'indirect' sale brought within the reach of section 1239 is one in which a strawman is used. The term when used in other sections, e.g. section 267(a)(1), is broader than that, see McWilliams v. Commissioner, 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947)...." Miller v. Commissioner, 510 F.2d 230, 233 (9th Cir.1975)
 
 
 [11]
 The trust provisions of section 267(b) provide, in pertinent part:
 The persons referred to in subsection (a) are:
 ....
 (4) A grantor and a fiduciary of any trust;
 (5) A fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts;
 (6) A fiduciary of a trust and a beneficiary of such trust;
 (7) A fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts;
 (8) A fiduciary of a trust and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for the trust or by or for a person who is a grantor of the trust.
 
 
 [12]
 Treasury Reg. Sec. 1.267(a)-1 provides that "section 267 is not exclusive. No deduction for losses, or unpaid expenses arising in a transaction which is not bona fide will be allowed even though section 267 does not apply to the transaction."
 The legislative history of the Revenue Act of 1937, which added the trust provisions to the predecessor of Sec. 267, makes clear that Congress did not intend for Sec. 267 to be the exclusive source for disallowing losses in cases involving trusts.
 [I]t is not intended by this amendment to imply any legislative sanction of claiming deductions for losses on sales or exchanges in cases not covered thereby, where the transaction lacks the elements of good faith or finality, generally characterizing sales and exchanges of property.
 S.Rep. No. 1242, 75th Cong., 1st Sess. (1937), reprinted in 1939-1 Cum. Bull. (Part 2) 703, 723.
 
 
 [13]
 In its initial motion for summary judgment, the government contended that the requirements of a bona fide loss under Sec. 165 were not satisfied. The trustees responded that the loss was bona fide. The district court granted summary judgment for the government, but based its conclusion on Sec. 267(b)(5). When this court later remanded the case to the district court, the issue of Sec. 165 was again raised. The district court again, however, did not rely upon it, and the trustees then brought this appeal
 
 
 [14]
 See, e.g., Wickwire v. United States, 116 F.2d 679 (6th Cir.1941); Derr v. Commissioner, 77 T.C. 708 (1981); National Lead Co. v. Commissioner, 40 T.C. 282 (1963)
 
 
 [15]
 Scully v. United States, 629 F.Supp. 1534, 1543 (C.D.Ill.1986)
 Our decision today should not be read to conflict with Widener v. Commissioner, 80 T.C. 304 (1983). In Widener, two trusts with related grantors, common trustees and a common current income beneficiary sold stock to each other to generate tax losses at the close of the year. Although the court concluded that the losses were bona fide under Sec. 165, the court applied the same legal analysis as we do here. The cases are reconcilable because of the substantial factual distinctions between them.
 In Widener, the two trusts were created 23 years apart by different grantors (a father and his son). The trustees of one trust were the Provident National Bank and William P. Wood. The trustees of the other trust were the Provident National Bank and H. Peter Somers. Thus, both trusts had one common trustee, but that trustee was a bank, and both trusts had a trustee individual to that trust. By its terms, one of the trusts was to terminate in 1992, and its assets were to be distributed to the income beneficiary. The other trust was not to terminate until at least 21 years after the income beneficiary's death, and possibly later. Hence, the tax court noted that the income beneficiary's interest in the principal of the two trusts was "substantially different." Id. at 312 n. 9. The trust in which the income beneficiary had no interest in the corpus had an investment policy that emphasized growth of the corpus, in deference to the interest of the future beneficiaries. Further, the income beneficiary had no voice in any specific investment decisions, and she was unaware of the transactions at issue in the case. Thus, the court concluded that the beneficiaries did not control the trusts, and that the trustees were independent.
 In the present case, unlike Widener, there is a complete identity of trust fiduciaries. The Selling Trusts and the Buying Trusts have identical beneficiaries, and neither set of trusts can be expected to terminate soon. The remainder interests of both sets of trusts are also held by the same individuals. The only differences between the Selling Trusts and the Buying Trusts are that: (1) the Selling Trusts might terminate later than the Buying Trusts because the Selling Trusts have three additional measuring lives, and; (2) all of the income of the Selling Trusts goes to the beneficiaries once they reach the age of 21, as opposed to the Buying Trusts, in which only 2/3 of the income goes to the beneficiaries. We do not believe that these minor differences, one of which is very contingent, alter the nature of the transaction here at issue.